(No. 14257.—Decree affirmed.)
MARY JANE CHANEY et al. Plaintiffs in Error, vs. DREW
BAKER et al. Defendants in Error.

*Opinion filed October 21, 1922.*

1. WILLS—*mere existence of a confidential relation does not create presumption of undue influence.* The mere existence of a confidential relation does not create the presumption of the exercise of undue influence in the execution of a will in favor of the fiduciary, as it is not the confidential relation, alone, which creates the presumption but the fact that such relation is used for the purpose of procuring the making of the will.

2. SAME—*when issue of undue influence is properly taken from jury.* In a will contest case, where there is no evidence that the testator committed to his son, who was chief beneficiary in the will, the entire management of his affairs but merely directed the son to sign checks for him at his request, and where there is nothing indicating that the execution of the will was procured by the influence of the son operating on the testator's mind or that he assisted in the preparation of the will, it is proper to direct the jury to disregard the issue of undue influence.

3. SAME—*contestants must overcome the presumption of sanity.* In a will contest case, where the proponents have shown the execution of the will and the sanity of the testator by the proof required by statute, the burden of proving the unsoundness of mind is on the contestants, and if they introduce evidence only sufficient to raise a doubt or to balance the evidence of sanity the presumption of sanity requires a determination of the question in favor of the proponents.

4. SAME—*extent to which inequality of distribution may be considered by the jury—instructions.* Where the jury have been instructed that inequality of distribution may be considered in determining whether the testator was of sound mind, it is proper to further instruct the jury that the testator was entitled to distribute his property as he pleased and that the proponents are not required to explain any inequality; but the abstract proposition that inequality of distribution is of itself no evidence of unsoundness of mind ought not to be given as an instruction.

5. SAME—*what instruction as to mental capacity is not erroneous.* In a will contest case an instruction which requires of the testator sufficient mental capacity "to know and understand the business in which he was then engaged" is not subject to the objection that it does not require a sufficient understanding of the

nature and effect of the will. (*Donovan* v. *St. Joseph's Home,* 295 Ill. 125, distinguished.)

6. SAME—*when jury should not be instructed to disregard evidence that beneficiary received money from testator.* In a will contest case the jury should not be instructed to disregard evidence that one of the chief beneficiaries under the will had received money from the testator for which it is claimed he had not accounted, where such evidence is proper to be considered in connection with provisions of the will making an unequal distribution of the property.

7. INSTRUCTIONS—*jury should not be instructed as to weight of each item of evidence.* If evidence is admitted for a particular purpose it is proper to confine its effect by an instruction stating the purpose for which it was admitted, but instructions ought not to single out one item of competent evidence and inform the jury that such item does not of itself establish the case.

WRIT OF ERROR to the Circuit Court of DeWitt county; the Hon. GEORGE A. SENTEL, Judge, presiding.

W. F. GRAY, A. F. MILLER, CHARLES Y. MILLER, and LEFORGEE, BLACK & SAMUELS, for plaintiffs in error.

HERRICK & HERRICK, for defendants in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

John Baker, of Weldon, in DeWitt county, executed his will on October 30, 1916, and died on July 10, 1918, being about eighty-four years old. He was survived by his widow, Fannie Baker, and his heirs were six daughters and two sons. His will was admitted to probate, and the two sons, Drew Baker and Wesley Baker, were appointed executors. He owned about 320 acres of land, some town property in Weldon, including his homestead, and personal property. His will devised all his estate, real and personal, to his wife for life and after her death 190 acres of the land to the sons, seven lots in Weldon, subject to a charge of $1000, to his son Wesley, and the homestead, subject to a charge of $1000, to his son Drew. Subject to some

provisions not necessary to mention, the will directed the conversion of the rest of the estate into money, giving to the two sons and to one of the daughters the option to buy certain portions of the real estate at $200 an acre. The money so derived, together with the two sums of $1000 each charged against the devises to Wesley and Drew, was directed to be distributed among the daughters. Five of the daughters filed a bill in the circuit court of DeWitt county against the other daughter and the two sons to contest the will on the ground of mental incompetency of the testator and undue influence exercised over him by Drew and Wesley. Issues were submitted to a jury, which were found in favor of the proponents of the will, the bill was dismissed for want of equity, and the complainants have sued out a writ of error to reverse the decree.

The testator was a native of England, where he lived until he arrived at manhood and was married, when he emigrated to this country in 1855 and soon after settled in DeWitt county, where he lived the remainder of his life and accumulated the property which he owned at his death. He moved from his farm to Weldon about 1900.

The court withdrew from the jury the consideration of the question of undue influence. The verdict in favor of the mental competency of the testator is claimed to be contrary to the weight of the evidence. About a month or two before executing his will the testator called upon the cashier of the State Bank of Weldon and told him that he wanted to execute a will and asked the cashier if he would be a witness. The cashier assented, and the testator then told him his plan for the distribution of his estate, which was in accordance with the will executed later. The testator also called upon W. A. Webb, who was the other witness to the will and was engaged in the grain business in Weldon, and asked him to be a witness. Later, when the will was ready, he called at Webb's office and they went to the bank together, where the will was executed. The next day the tes-

tator told Webb that he had discovered an error in the description and wanted him to sign again. Later Webb went to the bank and together with Swigart, the cashier, and the testator, went into the directors' room, where Swigart read aloud the will which Baker produced, and the will was then executed and attested.

After the testator moved to Weldon his land was occupied by tenants, two of whom were his sons. He gave to his land and his tenants such care and attention as circumstances required, receiving the assistance of his older son, Wesley, in the later years of his life. He was one of the five directors of the State Bank of Weldon, attended the meetings and took part in the conduct of its business, showing an intelligent interest in its affairs. Many witnesses were examined who testified to their long acquaintance with the testator and familiarity with him through the ordinary events which occur among neighbors and acquaintances. His transactions were for the most part neither large nor important, but taken together were sufficient to enable the persons who met him from day to day to form an opinion as to his soundness of mind. The opinions of the witnesses who testified in the case were almost uniformly that the testator was of sound mind and mentally competent to transact ordinary business. The witnesses who expressed such opinions, more than thirty in number, included officers of the bank, farmers, merchants, an assessor, a tax collector, men of various trades and callings. It would serve no purpose to discuss in detail the testimony of the witnesses. It shows that the testator was an old man whose physical powers were failing, who was somewhat deaf, and whose mental powers were not so active as they had been but who was still capable of understanding and managing his business and of participating in the control and decision of such matters of business as his circumstances required. Besides the physicians who testified, seven witnesses expressed opinions adverse to the testator's mental

competency. Two of them were ministers of the church to which the testator belonged and three others were members of that church. Their opinions were based largely on the testator's attitude toward the conduct of church affairs, particularly with reference to the use of the church for social purposes and for the activities of the Christian Endeavor Society and the giving of dinners in the church building. He did not believe in having the church bell ring for anything except the regular services or prayer meetings, did not believe in choir practice, disapproved of the discharge of the janitor and at another time of a change of the minister. He had expressed at one time the desire to have his funeral services conducted by a former minister of the church who was living in Oregon, but later he expressed to the minister who was then in charge of the church a change of purpose and a desire that the minister to whom he was talking should conduct the services. The witnesses thought that the conduct of the testator in giving his testimony at prayer meetings and his long-winded prayers, in which there was much repetition of certain phrases, indicated weakness of mind. Other witnesses testified to the testator's great interest in defeating the proposition to issue bonds for the establishment of a waterworks system and electric light plant in Weldon and to his unseemly rejoicing at the defeat of the proposition at the election and his loud declaration after the election that "we voted them down." He was opposed to building a new school house. He was opposed to hard roads. He did not believe in oiling the roads. He was opposed to a drainage district putting a tile drain through his farm instead of an open ditch. He took a very positive stand on those questions, and witnesses testified to his loud, long and tedious discussion of these questions on the street, when he would talk after his auditors had escaped. None of this testimony is sufficient, and all of it taken together is insufficient, to establish unsoundness of mind. It indicates the garrulity and the fixed-

ness of opinion of old age; an opposition to taxation for public improvements; notions, perhaps old-fashioned, in regard to propriety of conduct in church matters. The relation of religious experiences, the making of long prayers and the expressions used in doing these things may have been offensive to the taste and trying to the patience of the hearers. They may have justified regarding the speaker as eccentric, but they are not unusual in the conduct of many persons whose sanity nobody questions.

Two physicians who had never seen the testator but were experts in mental and nervous diseases, in response to hypothetical questions expressed the opinion that the testator was not of sound mind on October 30, 1916. A third physician who had been called to treat the testator at various times during several years before the will was executed also expressed an opinion unfavorable to the testator's mental competency. The hypothetical questions stated the facts supposed from the view of the proof held by the contestants' counsel. The jurors were not bound to accept that view as were the witnesses in answering the questions, and in consideration of the evidence as to the conduct of the testator and what he actually did, the verdict of the jury finding, on contradictory evidence, in favor of the testator's competency cannot be disturbed as manifestly against the weight of the evidence but in our judgment is in accordance with its weight.

The question of undue influence was withdrawn from the jury, and it is objected that a confidential relation existed between the testator and his son Wesley; that the will, by which the sons secured a material advantage over the daughters, was prepared at Wesley's suggestion; that the presumption is, therefore, that it was obtained by undue influence, and that the burden is upon the proponents to show that it was not so obtained. The mere existence of a confidential relation does not create the presumption of the exercise of undue influence in the execution of a will in favor

of the fiduciary. It is not the confidential relation which creates such a presumption, but it is the fact that the confidential relation is used for the purpose of procuring the making of the will. It does not appear that Wesley transacted his father's business. In the latter years of his life the checks which were drawn on the testator's account at the bank were usually signed by Wesley in his father's name, but so far as the evidence shows they were always drawn under the direction of the father and at his request. The accounts were presented to the testator, and after determining that they were right he directed Wesley to give a check for them, and there is no substantial evidence that the business of the testator was committed to Wesley or that the testator did not himself understand and control and direct the management of his affairs. It is true that Wesley took the testator in an automobile to the office of the lawyer in Farmer City who drew the will but he took no part in the preparation of the will. He left his father there alone with the attorney, who prepared the will under the testator's direction. There is nothing indicating that the execution of the will was procured by the influence of the son operating on the testator's mind. The court properly directed the jury to disregard the question of undue influence.

The court gave the following instruction at the request of the defendants in error:

"The court instructs the jury that to justify a finding that the testator is not of sound mind and memory in the making of a will, the evidence must preponderate in favor of unsoundness of mind, and the presumption of sanity must prevail, if the evidence is only sufficient to raise a doubt as to such sanity."

This is substantially the same as the thirteenth instruction which was approved in *Grace v. Grace,* 270 Ill. 558. The proponents having shown the execution of the will and the sanity of the testator by the proof required by the statute were entitled to the benefit of the legal presumption of

sanity, (*Craig* v. *Southard,* 162 Ill. 209,) and if the evidence on that question were only sufficient to raise a doubt or were equally balanced, such presumption would require a determination of the question in favor of sanity.

The fifth instruction is equivalent to the fourth instruction in *Craig* v. *Southard, supra.* In this case, as in that, the jury were instructed that where the execution of a will and the soundness of mind of the testator were proved by the subscribing witnesses the burden of proof of unsoundness of mind was on the contestants. There was no question that such proof was made and it was not error to give the instruction.

The sixth and seventh instructions informed the jury, in substance, that a person capable of making a will had a right to distribute his property among his relatives as he saw fit, or to give all his property to some of them or to one of them, or to give it all to a person or to persons not related to him, and that the proponents of his will were under no obligation to excuse or explain any inequality of distribution. It was not wrong to give them. The jury were told by the first two instructions given at the request of the plaintiffs in error that inequality of distribution might be considered as a circumstance in determining whether the instrument in question was the will of John Baker, and that the will itself, its propriety or impropriety, its reasonableness or unreasonableness, might be considered in determining whether the testator was of sound mind, or not, at the date of its execution. It may be said here as was said in a like case in *Larabee* v. *Larabee,* 240 Ill. 576, that the jury could not have believed the instructions complained of meant more than that they were not called upon to remedy any injustice or unfairness in the disposition of his property made by the testator.

The eighth instruction, after stating that a testator has a right to dispose of his property in such manner as he chooses and that the justice, reasonableness and propriety of

304—24

his will are not questions for the jury to pass on, concludes with this sentence: "If, therefore, you believe from the evidence that when John Baker executed the paper in evidence purporting to be his last will and testament he had mental capacity enough to know and understand the business in which he was then engaged, then the jury should find the papers in evidence to be the will of the said John Baker." Objection is made that ability of a testator to know and understand the business in which he was engaged is not a correct test of the mental capacity required to make a will, and *Donovan* v. *St. Joseph's Home,* 295 Ill. 125, is cited as authority to the contrary. The instruction in that case required of the testator only sufficient mental capacity to understand what he was doing, that he intended to make his will, and that he knew the natural objects of his bounty and what property he had. It was held that this was not the measure of capacity required to make a will, but that a testator, besides understanding that he is making a will, must have mind and memory sound enough to appreciate the business in which he is engaged, to comprehend what property he has to dispose of and the natural objects of his bounty, and to understand the nature of his act and the effect of his will. The eighth instruction required not only that the testator knew he was making a will but that he understood the business in which he was then engaged,— that is, the will which he was making and the meaning and effect of its terms. To understand means to have full and clear knowledge of, to have thorough apprehension of, to comprehend. A man may understand that he is making a will and may go through with the execution of it and have no comprehension of the effect of the will even though he knows his children and what property he has. However, if he understands the business in which he is engaged while making his will he necessarily comprehends the effect of his will. In Redfield on Wills, 123, it is said: "The result of the best considered cases upon the subject seems to

put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should, at the time of executing the will, know and understand what he was about." In *Yoe* v. *McCord*, 74 Ill. 33, the court, after quoting this statement, said that "this last mode of expression of the doctrine is intelligible to a jury and embodies about the whole rule upon the subject so far as it can be profitably given to a jury. * * * When a court undertakes to inform them what amount of mental capacity a man must have to know and understand what he is about it is futile and tends rather to mislead than to afford any practical aid to a jury." The same view was expressed in *Todd* v. *Todd*, 221 Ill. 410, and these cases were cited and approved in *Donovan* v. *St. Joseph's Home, supra.*

The eleventh instruction informed the jury that unsoundness of mind, within the meaning of the law, is a disease of the brain affecting the mind to such an extent as to destroy a man's capacity to understand the business he was engaged in when making the will, and unless the jury believed from the evidence that the testator's brain was diseased to such an extent that he did not have mind and memory sufficient to enable him to know and understand the particular business he was engaged in at the time he made the instrument in question, the jury should find that it was the testator's will. The objection is made to this instruction that it leads the jury to believe that before a man is incapable of making a will it must be shown that his brain was diseased. Perhaps it is not technically accurate to say that unsoundness of mind is a disease of the brain, but it was held in *Hartrick* v. *Hartrick*, 272 Ill. 613, that it was not error in an instruction to refer to unsoundness of mind as a disease of the brain, and the instruction was not harmful in this case.

The fourteenth instruction told the jury that the fact that the testator left some of his children only a compara-

tively small amount of his property is of itself no evidence whatever of unsoundness of mind, and it is not necessary for the proponents to prove that John Baker had any reason or excuse for any such provision in his will. Instructions ought not to select one item of competent evidence and inform the jury that that item of itself does not establish the case. If it is competent evidence it should be considered by the jury, and if the jury should be instructed as to each item of evidence that of itself would not prove the case, the tendency of such instructions would be to minimize the weight to be given to each particular item of evidence so referred to and so to minimize the weight of all the evidence. If evidence is admitted for a particular purpose it is proper to confine its effect by an instruction to the purpose for which it was admitted, but the abstract proposition of law that inequality of distribution of property is of itself no evidence of unsoundness of mind ought not to be given. Such inequality is competent for the consideration of the jury, who are to determine, as a question of fact, its weight and effect in the particular case upon the question of unsoundness of mind. The plaintiffs in error, however, in the first instruction given at their request, asked the court to instruct the jury that "inequality in the distribution of property among those who would inherit it if no will was made is not of itself evidence of unsoundness of mind," and having procured the giving of this instruction they cannot complain of the action of the court in giving the same instruction at the request of defendants in error.

It was not error to give the fifteenth instruction, which told the jurors that they had nothing to do with remedying any unfairness in the disposition of the testator's property made by his will, if any such unfairness appeared. *Larabee* v. *Larabee, supra.*

By the twentieth instruction the court instructed the jury that "in the consideration of this case you will disregard all the evidence in regard to Wesley Baker receiving

any money from his father for which it is claimed he has not accounted, as that matter is not an issue in this case." The plaintiffs in error introduced testimony to show that Wesley had received money from his father which he had not re-paid. This evidence was proper to be considered in connection with the other provisions of the will as bearing on the inequality of the distribution of his property made by the testator, and the instruction ought not to have been given. The evidence was, however, of little importance and could have had no effect upon the verdict.

The decree will be affirmed.