(No. 15627.—Reversed and remanded.)
Lena Speirer, Appellee, *vs.* Arthur J. Curtis *et al.*
Appellants.

*Opinion filed April 14, 1924.*

1. Wills—*jury must determine whether the testator had sound mind and memory for execution of will.* By the act in regard to wills every adult who is of sound mind and memory has power to dispose of all his property by will, and in a will contest it is for the jury to determine, according to the legal meaning of the phrase as applied to the right to dispose of property by will, whether the testator was of sound mind and memory.

2. Same—*meaning of the phrase "sound mind and memory."* The phrase "sound mind and memory" has no definite meaning in the general understanding and furnishes no standard for determining what in law constitutes sound mind and memory, but, as applied to capacity to execute a will, absolute soundness and mental capacity are not required, but only that degree of mental power and vigor which a testator should possess in order to be able to dispose of his property by will.

3. Same—*when testator has sufficient mental capacity to make will.* Where a testator knows the extent of his estate, the natural objects of his bounty and to whom he wishes to give his property, and understands what he is doing and the nature of his act and the effect of his will, he has sufficient mental capacity to execute his will, whether the disposition he makes is reasonable or unreasonable, unless such disposition indicates a morbid and insane delusion as to the natural objects of his bounty.

4. Same—*mere physical infirmities do not render testator incapable of executing will.* No physical infirmity, mental weakness, nervousness, derangement or imbecility will incapacitate a testator from making a valid will unless it is of such character as renders him incapable of understanding the business in which he is engaged when he makes his will.

5. Same—*when non-expert may give opinion as to mental capacity.* A person who is not an expert may give his opinion concerning the mental capacity of testator after first detailing the particular facts and circumstances upon which he bases his judgment, leaving the jury to put such value upon the opinion expressed as the intelligence and capacity of the witness to form it will warrant.

6. Same—*witnesses may give opinions based on observation of the testator's mental capacity to transact ordinary business.* While

capacity to transact ordinary business is a higher test than the law requires for the execution of a will, yet proponents may prove, if they can, that the testator had a very high degree of mental capacity, and witnesses who have stated their observation in that respect may give their opinions to the jury, subject to cross-examination as to their basis.

7. SAME—*opinions as to testator's soundness of mind are admissible as conclusions of fact.* Opinions of witnesses as to sound mind and memory, ability to transact ordinary business, and the like, are all conclusions of fact, which are admissible to enable the jury, under proper instructions as to sound mind and memory, to say whether the testator had mental capacity to make his will.

8. SAME—*witnesses should not be limited to opinions as to testator's "sound mind and memory."* Witnesses who have detailed the circumstances of their acquaintance and transactions with the testator, in giving their opinions as to his mental capacity should not be restricted to the single question whether the testator was of sound mind and memory when he executed his will.

APPEAL from the Circuit Court of Knox county; the Hon. WILLIS F. GRAHAM, Judge, presiding.

HARDY & HARDY, and MARSH, RICE & THOMPSON, for appellants.

CARNEY, CARNEY & NELSON, and WILLIAMS, LAWRENCE, GREEN & GALE, (JAMES W. CARNEY, GEORGE C. GALE, and SIG B. NELSON, of counsel,) for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

On August 24, 1921, John L. Curtis, of the city of Galesburg, executed his last will and testament, witnessed by W. H. Venn, George W. Palmer and W. C. Frank, who subscribed the usual attestation clause, in which they declared that they believed him to be of sound mind and memory. He had a wife, Elizabeth Curtis; a married daughter, Lena Speirer; and two brothers, Arthur J. and Frank E. Curtis. Pearl Moore, a daughter of his wife's brother, had been taken into his family when she was four

years of age and was a member of the family until she was married, and she was then thirty-three years old, and all these persons survived him. By his will, which disposed of property of the value of about $50,000, all of the property, real and personal, after the payment of debts, was given to his wife during her natural life. At her death the will directed that $10,000 should be paid to Pearl Moore and the remainder of the estate should be divided into two equal parts, one part to be given to the daughter, Lena Speirer, and the other part to be divided equally between the brothers, Arthur J. and Frank E. Curtis, who were appointed executors. The testator died on December 28, 1921, and the will was admitted to probate. Lena Speirer, the daughter, filed her bill in the circuit court of Knox county to set aside the will, alleging want of mental capacity and the exercise of undue influence by the brothers, Arthur J. and Frank E. Curtis. Elizabeth Curtis and Pearl Moore were defaulted, and the bill was answered by Arthur J. and Frank E. Curtis, in their own right and as executors. The court submitted to the jury the following questions:

1. "Is the instrument in writing dated August 24, 1921, the last will of John L. Curtis?"

2. "At the time the instrument in writing dated August 24, 1921, was executed, was John L. Curtis of sufficient mind and memory to execute the same?"

3. "At the time of the execution of the instrument in writing dated August 24, 1921, was John L. Curtis unduly influenced to execute the same by Arthur J. Curtis and Frank E. Curtis, or either of them?"

The jury returned a verdict that the instrument was not the last will and testament of John L. Curtis, and answered the first and second questions "no" and the third question "yes." The court entered a decree in accordance with the verdict, setting aside the will and rendering judgment for the costs against Arthur J. and Frank E. Curtis individually, who appealed from the decree.

The will was written and witnessed by Walter C. Frank, an old acquaintance of John L. Curtis, and he testified that about a year before the will was drawn Curtis asked him if he would write his will for him some day, and he told Curtis that he would, and to let him know when he was ready. When the will was drawn Frank had become judge of the circuit court, and on the day of its execution Frank Curtis telephoned him to go to the house of John L. Curtis. He went to the home and went up-stairs to Curtis' room, where he found him and a nurse. The nurse left the room and Judge Frank asked Curtis how he felt, and he replied that he was not much good; was nervous and pretty sick. They had a general conversation about the Methodist church in Galesburg, and about farming, in which Curtis had been engaged before moving to Galesburg, and the uncertain and unsatisfactory conditions. Curtis then gave Judge Frank directions for writing the will, and said he wanted his wife to have all his property as long as she lived and after her death he wanted to give $10,000 to Pearl Moore,—the girl who had lived with them,—and after that legacy he wanted the balance divided, one-half to go to his daughter, Lena Speirer, and the other half to be divided between his brothers, Arthur J. and Frank E. Curtis. He said that his daughter was a fine. girl; that she had married a splendid fellow, who was taking his place in his old community where he had lived and was trustee of a church or on some board. Judge Frank said that it would look funny to give as much money to the brothers as to his daughter, and Curtis said he expected Arthur and Frank to take care of his widow, manage the property as long as she lived, and by the time she should die they would have earned that much of it. He told Judge Frank about his property and what it was worth and an interest which he had in land in Canada, and that he wanted the executors to have power to sell real estate whenever needed for the best interest of the estate or the welfare of the widow. There was no one

within hearing when these directions were given and Judge Frank had talked with no one about the will, except the telephone from Frank Curtis to come over. Judge Frank made a pencil memorandum and went down-stairs and wrote the will and went back to Curtis' room and read it to him, and Curtis said that was the way he wanted it. Judge Frank told someone, when he was writing the will, to get witnesses, and the will was executed with all the formalities required by law.

W. H. Venn, who signed the attestation clause, testified to the execution of the will. George W. Palmer, the other witness to the will, testified for the contestant that he did not know that anyone asked him to go to the home of John L. Curtis to sign the will but he went in pursuance of something his wife told him. He testified to the execution of the will, and did not testify to any act, appearance or statement of Curtis at the time tending to show that he was not of sound mind and memory or that he did not so believe when he attested the will, but testified that he had known Curtis and had talked with him about getting money to pay for mowing the cemetery, and Curtis said he expected he ought to, and that he saw him afterward and he appeared nervous and looked as though he was getting weaker. He did not say that he did not believe the testator to be of sound mind and memory when he attested the will nor question the truth of the attestation clause, which, of course, would have practically destroyed his credit as a witness, but from his knowledge of Curtis he said that when he testified his opinion was that he was not of sound mind and memory. He said on cross-examination that he did not know that Curtis at the time said or did anything to indicate that he was of unsound mind, and he explained his testimony by saying that as a matter of fact he never had any idea of any kind or character that Curtis was not of sound mind on August 24, 1921, but the disposition of the property in the will did not suit him very well; that if

it had been according to his idea of what Curtis should have done to his property he never would have appeared in any court to testify that he was of unsound mind on August 24, 1921, and the disposition made of the property was the real basis of his opinion.

The judgment will be reversed and the cause remanded on account of an erroneous ruling restricting witnesses in giving their opinions as to the mental capacity of the testator to the single and simple question whether the testator was of sound mind and memory. Aside from the testimony of the witnesses to the will a great many witnesses were examined on both sides, but there was very little, if any, dispute as to the facts on which their opinions were based. Witnesses for the proponents testified to business transactions with the testator, conversations with him and observations of his appearance and conduct and gave opinions that he was of sound mind and memory, and witnesses for the contestant testified to observations of him, statements made by him, and an extreme nervous condition, and gave opinions that he was not of sound mind and memory. The first witness testifying for the proponents, after stating that he saw the testator once a week or once every two weeks during 1921 and talked to him in relation to the stand of corn on the testator's farm and other matters of that kind, was asked for an opinion as to whether he had sufficient mental capacity to transact ordinary business. An objection was sustained by the court, with a statement that it called for a conclusion of the witness and invaded the province of the jury. This ruling was carried out throughout the trial, and the only question which the court permitted to be put to a witness who had observed the testator or had business transactions with him, was the single, ultimate fact to be determined by the jury, whether he was of sound mind and memory when he executed his will.

By the act in regard to wills every adult who is of sound mind and memory has power to dispose of all his property

by will, and on the trial of an issue before a jury whether the testator had mental capacity, the province of the jury is to determine whether the testator was of sound mind and memory and find a verdict according to the ultimate fact. Although the jury were to determine the question whether a testator was of sound mind and memory, the determination was to be according to the legal meaning of that phrase as applied to the right to dispose of property by will. The phrase "sound mind and memory" has no definite meaning in the general understanding and furnishes no standard for determining what in law constitutes sound mind and memory. Long prior to the enactment of our statute the legal meaning of the phrase "sound mind and memory" had become well established, and denoted that degree of mental strength and power deemed requisite to testamentary capacity. Absolute soundness and mental capacity were not requisite to such capacity, and that was not the interpretation of the word "sound," but the phrase was employed as expressing that degree of mental power and vigor which a testator should possess in order to be able to dispose of his property by will. (*Daly* v. *Daly,* 183 Ill. 269.) In *Todd* v. *Todd,* 221 Ill. 410, the court quoted from Redfield on Wills as follows: "The result of the best considered cases upon the subject seems to put the quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he is about." It has frequently been defined as meaning that the testator must be able to understand the business in which he is engaged when he makes his will and to appreciate the effect of the disposition made by him of his property. If he knows his estate, the object of his affections and to whom he wishes to give his property and understands the business in which he is engaged he has sufficient capacity to make a will. No physical infirmity, mental weakness,

nervousness or nervous condition will deprive a testator of testamentary capacity if his mind and memory are sufficient under these definitions of sound mind and memory. Any such infirmity must be such as to impair the testator's mind so that he is incapable of understanding the business in which he is engaged in making his will. He must understand not only that he is making a will, but have mind and memory sound enough to appreciate the business in which he is engaged, to comprehend what property he was to dispose of, the natural objects of his bounty, the nature of his act and the effect of his will. If he has such mental capacity he may execute a valid will disposing of his property, whether reasonable or unreasonable, unless affected with some morbid and insane delusion as to some one of the natural objects of his bounty. *Campbell* v. *Campbell,* 130 Ill. 466; *Waters* v. *Waters,* 222 id. 26; *Trubey* v. *Richardson,* 224 id. 136; *Wilkinson* v. *Service,* 249 id. 146; *Austin* v. *Austin,* 260 id. 299; *Carnahan* v. *Hamilton,* 265 id. 508.

It has always been the rule in this State that a person who is not an expert may give his opinion concerning the mental capacity of a testator after first detailing the particular facts and circumstances upon which he bases his judgment, leaving the jury to fix such value upon the opinion expressed as the intelligence and capacity of the witness to form it will warrant. The rule was established in *Roe* v. *Taylor,* 45 Ill. 485, although it was said that there was much conflict of authority on that point. The rule has been consistently followed ever since. *American Bible Society* v. *Price,* 115 Ill. 623; *Graybeal* v. *Gardner,* 146 id. 337; *Snell* v. *Weldon,* 239 id. 279.

It has always been held that a person who is capable of transacting ordinary business is also capable of making a valid will. The derangement or imbecility to incapacitate a person from making a valid will must be of that character which renders him incapable of understanding the effect

and consequences of his acts, and a party capable of act-
ing rationally in the ordinary affairs of life has testa-
mentary capacity. (*Meeker* v. *Meeker,* 75 Ill. 260; *Greene*
v. *Greene,* 145 id. 264; *Craig* v. *Southard,* 148 id. 37; *Row-
cliffe* v. *Belson,* 261 id. 566.) It is true that capacity to
transact ordinary business is a higher test than the law re-
quires, (*Taylor* v. *Cox,* 153 Ill. 220,) but that furnishes no
reason why a testator may not meet the higher test. Pro-
ponents may prove, if they can, that the testator had a very
high degree of mental capacity, and witnesses who have
stated their observation in that respect may give their opin-
ions to the jury, subject to cross-examination as to their
basis. Opinions of witnesses as to sound mind and mem-
ory, ability to transact ordinary business, and the like, are
all conclusions of fact which are admissible to enable the
jury, under proper instructions as to sound mind and mem-
ory, to determine whether the testator had mental capacity
to execute his will.

On the issue of undue influence it is clear that John L.
Curtis had long entertained a fixed intention to give a be-
quest to Pearl Moore, and, of course, there was nothing
indicating undue influence in giving all his property to his
wife for her natural life. It appears that although he had
a fixed intention to make a bequest to Pearl Moore and had
declared such intention, he was a sufferer from some stom-
ach trouble, which the doctors thought was probably can-
cer of the stomach, although there was never any certainty
about it for want of a post-mortem examination; that he
told Pearl Moore that he wished he had made his will, and
if it were not for her he never would think of making a
will; that he dreaded the actual execution of the will and
expressed a dislike to be troubled about it. There was evi-
dence that on the morning the will was made Frank Curtis
told the testator he thought he ought to make a will and
the testator said he was not able to make a will, and Frank
said to give it to Lib for her lifetime, and the testator said;

"We must not forget Pearl; we will give Pearl $20,000;" that Frank said $20,000 was too much for Pearl, and the nurse said Pearl would be very grateful for $10,000, but that was the testator's affair and not hers. The nurse said that Frank also said, "Let it come back to the Curtis heirs," and if that was the advice given it was not followed out, since there was no limitation to the Curtis heirs. There was also testimony that when the will was read Frank Curtis said to Pearl Moore if it had not been for him she would not have got anything.

In view of the erroneous ruling on the admission of evidence there would be no profit in devoting any time to the testimony of the great number of witnesses and the volume of instructions given to the jury.

The decree is reversed and the cause remanded.

*Reversed and remanded.*