ELMER E. DOWN *et al.* Appellants, *vs.* JULIA A. COMSTOCK
*et al.* Appellees.

*Opinion filed October 28, 1925—Rehearing denied December 2, 1925.*

1. WILLS—*when non-expert may express opinion as to mental capacity.* A person who is not an expert may give his opinion concerning the mental capacity of a testator after first detailing the particular facts and circumstances upon which he bases his judgment, and the jury will put such value upon the opinion as the capacity, intelligence and observation of the witness may warrant.

2. SAME—*foundation for non-expert opinion rests with court.* There is no rule as to what evidence is necessary to lay a foundation for the opinion of a non-expert witness in a will contest case, the question being one for the trial court to determine, and unless the court abuses its discretion the admission of such testimony will not effect a reversal of the decree, for an opinion not based upon sufficient knowledge is of little probative force.

3. SAME—*when an instruction does not assume validity of will.* An instruction in a will contest is not prejudicial in referring to the instrument as a will, where no reasonable inference can be drawn from the instruction that the validity of the instrument was assumed or had been determined and where other instructions properly use the word "instrument" or the words "purported will."

4. SAME—*instruction may use word "business" in referring to making of will.* Although the word "business" ordinarily means a principal, serious concern or interest, constant employment or a regular occupation, an instruction defining testamentary capacity may use such word in stating the condition that the testator must be able to understand "the particular business in which he was then engaged," where there is no reason for the jury to infer any other occupation than that of making a will.

5. SAME—*testamentary capacity requires only the ability to comprehend natural objects of bounty.* A testator is required only to have capacity to know who are the natural objects of his bounty and to be able to remember them, and it is not necessary that he actually know or remember them.

6. SAME—*mental perfection not necessary to make a will—instruction.* A mind absolutely sound is not required in order to make a will, and an instruction is not erroneous in stating that it is not necessary that the mind be "unshattered" by disease, as the word "shattered," when applied to the mind, does not mean destroyed.

7. SAME—*instructions may recite what conditions of mentality do not constitute incapacity to make will.* As it is impossible to define the degree of mental capacity which a testator must possess in order to make a valid will, it is not objectionable, in instructing the jury in a will contest, to mention certain conditions which, although showing impaired mental powers, are not sufficient to constitute incapacity to make a will, and instructions are not argumentative because, in stating different propositions, certain general rules of law stated in other instructions are repeated.

8. SAME—*testamentary capacity on day of execution of will is required.* A testator's mental capacity is determined as of the day on which the will was executed, and if he understands the contents and meaning of the will on that day, the fact that the instrument was drawn some weeks before it was executed is immaterial.

9. SAME—*instruction may use masculine pronoun in referring to witness.* Masculine terms are often used in a generic sense, and it is not improper, in instructions referring to witnesses generally in a will contest, to use the masculine pronouns "he" and "his" although some of the witnesses were women.

10. SAME—*unequal distribution of property is not evidence of unsoundness of mind—instruction.* The fact that a testator has made an unequal distribution of his property is not evidence of unsoundness of mind, but it may be considered as a circumstance, together with all the other facts and circumstances shown by the evidence, as tending to show unsoundness of mind, and declarations of the testator showing an intention to make an equal distribution should be considered only on the question of mental capacity; and it is proper to instruct the jury to disregard evidence on the question of equality of distribution if they find that, without regard to such evidence, he had sufficient mental capacity to make a valid will.

11. SAME—*consideration of particular evidence may be limited by instruction.* If evidence is admitted for a particular purpose it is proper by an instruction to confine its effect to the purpose for which it is admitted or to state how it must be considered.

12. SAME—*what is prima facie proof of validity of a will—instruction.* The law presumes every person to be of sound mind, and when a will has been executed with the formalities required by law, the evidence of incapacity must clearly preponderate to authorize the setting aside of the will; and in a will contest, an instruction stating that the certificate of the oaths of the subscribing witnesses makes *prima facie* proof of the "validity of the instrument" is not improper in the use of the words quoted, where the meaning of the term *"prima facie"* is explained in the succeeding language of the instruction.

13. INSTRUCTIONS—*an instruction not applicable to the facts is properly refused.* The purpose of instructions is to inform the jury of the rules of law applicable to the facts which the evidence fairly tends to prove, and an instruction which states the law correctly but in an abstract form, or is not so drawn as to be applicable to the facts of the case, is properly refused.

APPEAL from the Circuit Court of Kankakee county; the Hon. ARTHUR W. DESELM, Judge, presiding.

WALTER C. SCHNEIDER, and MILLER & STREETER, for appellants.

W. R. HUNTER, COSTIGAN & WOLLRAB, and EVA L. MINOR, for appellees.

Mr. JUSTICE DEYOUNG delivered the opinion of the court:

Charles W. Down, a widower, of the city and county of Kankakee, on January 2, 1920, when eighty-two years of age, executed his last will and testament. By this instrument he gave (1) to his son Elmer E. Down a life estate in 320 acres of land in Ford county, with the remainder to Elmer's children, but if he left no issue, then to the children of testator's son Ward W. Down; (2) to his son Ward a life estate in 295 acres of land in the same county, with the remainder to Ward's children; (3) to his daughter Julia A. Comstock a life estate in 240 acres of land in Iroquois county, with the remainder to her children, but in the event of her death without issue, then to the children of testator's son Ward; (4) to his daughter Olive E. Carlin, for her life, an annuity of $2000, of which Elmer and Ward, the sons, were each required to pay $500, and Julia A. Comstock, a daughter, $1000, in equal installments on the first days of January and of July in each year, which obligations were made liens on the lands devised to Elmer, Ward and Julia, respectively; and (5) to his daughter

Julia the residue of the estate. Mrs. Comstock and testator's daughter-in-law Catherine Down were named executrices. The testator died at Kankakee on February 25, 1922, and left surviving him as his heirs the sons and daughters mentioned in the will. It was admitted to record by the county court of Kankakee county on April 7, 1922, and letters testamentary were issued to the executrices therein named. Subsequently Elmer and Ward, the two sons, and Olive E. Carlin, a daughter, filed their bill of complaint in the circuit court of Kankakee county to set aside the will, alleging its alteration and partial destruction and the testator's want of testamentary capacity. The former issue was withdrawn upon the trial and the other question, only, was submitted to the jury. The verdict sustained the will, and after a motion for a new trial had been denied a decree in accordance with the verdict was entered. From that decree the complainants prosecute this appeal.

The testator, who was a native of England, came to the United States at the age of thirteen. At the time of his death he owned four farms in Ford, Iroquois and Kankakee counties, unencumbered and comprising 1163 acres, and personal property valued at approximately $117,000, consisting of notes, shares of stock, Liberty and other bonds. He ceased to do the active work of farming about twenty years prior to his death, and after his retirement let his farms to tenants, made leases, entered into contracts for repairs and improvements and otherwise managed his estate. During the last years of his life he was a member of the Elks and met various members of that organization at the lodge hall almost daily. On November 23, 1919, he called upon an attorney at Kankakee with a will which he had executed prior to that time. He desired certain changes made in it, and these were noted upon the existing will by the attorney. The testator was informed that the new draft would be ready on the next day. He did not return to the attorney's office until January 2, 1920, when he read the

new will, pronounced it satisfactory and executed it in the presence of witnesses.

The testator had infirmities that are incident to old age, and their extent and effect upon his mental powers were in dispute. His eyesight and hearing were impaired, the normal functioning of his heart, kidneys and blood vessels was disturbed, and he was subject to vertigo, and had fallen unconscious on two or more occasions. He died of apoplexy at a hospital where he had lived about a year.

Twenty-six witnesses called by appellees expressed the opinion, based upon their observation of the testator, that he was of sound mind. Some of these witnesses had met the testator in a social way, others had associated with him in his lodge activities, and some had conversed with him on many occasions concerning farms, crops and the prices of agricultural products. Witnesses who had been acquainted with the testator for many years testified that he examined and extended leases of his lands, made settlements with tenants, attended to the repair of buildings and personally transacted other matters of business. They observed no change in his mental condition, although one or two witnesses admitted that he was weak physically. A physician who had attended the testator believed he was sound mentally. Another physician who had observed him expressed the same opinion.

Appellants called twenty-three witnesses. The important incidents upon which one or more of these witnesses based their opinion that the testator was of unsound mind were, that at times he failed to recognize persons with whom he was acquainted; that occasionally, when asked a question, he would request the person who interrogated him to wait a moment until his mind cleared up; that often when alone in his room he would speak loudly to himself; that he was excitable; that he gave inconsistent and contradictory directions concerning the work of his tenants and the use of certain ground; that on one occasion he wanted

318—29

some posts cut to a certain length but afterwards ordered them shortened, and when his later directions had been followed he said that the posts had been spoiled; that he disliked the son of a certain tenant and refused to renew the latter's lease unless the son left the farm; that he objected to the payment by a tenant of sixty cents an hour for certain carpenter work, and that in making a return of his income tax he forgot to include the interest on a large number of bonds until later on the same day, when it was included in an amended return. Dr. J. L. Greene, formerly superintendent of the State Hospital for the Insane near Kankakee, testified that the testator had been under his observation at Hot Springs, Arkansas, from March 24 to May 19, 1920; that he found that the testator had high blood pressure; that there was imperfect functioning of the kidneys; that he had a skin disease, suffered from attacks of vertigo and had some clouding of consciousness; that an urinalysis showed that he had albumin and hilly and granule casts in his urine; that he had arteriosclerosis in an advanced stage and had suffered from it at least ten years; that he was also afflicted with senile dementia, and that in the opinion of the witness the testator was of unsound mind. On cross-examination Dr. Greene stated that even though the testator had been able to manage his business, examine and correct leases, let contracts for houses, sell land and attend to business of that character, he might still be of unsound memory. Two other physicians were asked hypothetical questions embodying the material parts of the testimony offered on behalf of the contestants, and each stated that he believed that the person described in the question was of unsound mind. On cross-examination one of these witnesses admitted that if the person described was able to enter into leases with tenants, collect rents, attend to repairs and transact business which would grow out of the letting of large tracts of land he would not say that such a person was mentally unsound.

The errors assigned and argued by the appellants are: (1) The admission of incompetent testimony concerning the mental capacity of the testator offered by appellees; (2) the giving of erroneous instructions at appellees' request; and (3) the refusal to give certain instructions requested by appellants.

It is argued that seven lay witnesses who testified that in their opinions the testator was of sound mind failed to state sufficient facts upon which to base their opinions, and that in consequence their testimony should have been excluded. Each of these witnesses talked with the testator on a number of occasions concerning current events and social or business matters, and each had ample opportunity to observe him carefully. The rule is that a person who is not an expert may give his opinion concerning the mental capacity of a testator after first detailing the particular facts and circumstances upon which he bases his judgment, and that the jury will fix such value upon the opinion so expressed as the capacity, intelligence and observation of the witness who forms it may warrant. (*Speirer* v. *Curtis*, 312 Ill. 152.) No rule can be laid down which in any given case will determine how much evidence is necessary to lay the foundation for the admission of non-expert opinion evidence in cases of this character. The question whether the facts stated form a sufficient basis for such an opinion is one for the trial court to determine, and unless that court has abused its discretion the admission of such testimony will not effect a reversal of the decree, for an opinion not based upon sufficient knowledge is of little probative force. (*Catt* v. *Robins*, 305 Ill. 76.) We have examined the testimony to which objection was made and find that it was competent. *Britt* v. *Darnell*, 315 Ill. 385.

Complaint is made of the first instruction given at appellees' request because it refers to the instrument as a "will." Whether the instrument was a will, it is argued, was for the jury to determine. All the first instruction at-

tempted to do was to define the terms "contestants" and "proponents." The second, third, ninth, tenth, eleventh and twelfth instructions referred to the instrument in question as "said instrument," "the writing here produced," or "purported will." It would have been more accurate to have used the word "instrument" or the words "purported will" in the first instruction, but taking all the instructions together, the jury could not fail to understand that the instrument was contested for the alleged lack of testamentary capacity. No reasonable inference could be drawn from the first instruction that the validity of the instrument was assumed or had been determined.

The second instruction informed the jury that if the decedent, at the time he executed the instrument purporting to be his will, had sufficient mind and memory to enable him to understand the particular business in which he was then engaged, and was able to remember who were the natural objects of his bounty, recall to mind his property and make disposition of it understandingly, according to some purpose or plan formed in his mind, he was possessed of testamentary capacity under the law. By the use of the phrase "had sufficient mind and memory to enable him to understand the particular business in which he was then engaged," it is argued the jury might understand that farming, rather than the making of a will, was intended. Ordinarily, it is true, the performance of some particular act is not referred to as a business. Most definitions of "business" imply, if not express, the idea of permanence; something more than a single undertaking. (1 Words and Phrases,—2d series,—p. 534.) "Business" means a principal serious concern or interest, constant employment, or a regular occupation. (Webster's New Int. Dict.) Whether strictly accurate, the phrase has been often used with reference to the execution of a will. (*McCoy* v. *Sheehy,* 252 Ill. 509; *Williams* v. *Ragland,* 307 id. 386; *Speirer* v. *Curtis, supra; Chaney* v. *Baker,* 304 Ill. 362.) Moreover, it ap-

peared from the evidence, without contradiction, that at the
time the instrument was executed, and for years prior there-
to, the testator had not been engaged in farming. The jury
could not infer that the instruction had any reference to
that occupation. It is asserted that the phrase, "was able
to remember who were the natural objects of his bounty,"
is erroneous because a testator must not only be able to
remember but must actually remember them when he exe-
cutes his will. The question is not whether a testator
actually remembers the natural objects of his bounty, but
whether he has, when he makes his will, the capacity to do
so. There is a marked difference between the capacity to
comprehend and actual comprehension. It is not the fact
of recollection but the ability to recollect which is the test
of mental capacity. (*Dowdey* v. *Palmer,* 287 Ill. 42.) Ob-
jection is also made to the phrase "recall to mind his prop-
erty," because it does not include the extent and value of
the property. The words which follow, "and make disposi-
tion of it understandingly according to some purpose or
plan formed in his mind," in connection with the other con-
ditions set forth in the instruction, sufficiently informed the
jury that the testator must have been able to comprehend the
disposition he sought to make of his property. *Chaney* v.
*Baker, supra; Gregory* v. *Richey,* 307 Ill. 219.

The third instruction began by informing the jury that
to constitute a sound and disposing mind it was not neces-
sary that the mind should be unbroken, unimpaired or un-
shattered by disease or otherwise or that the testator should
be in full possession of his reasoning powers, and it con-
cluded with the definition of testamentary capacity set forth
in the second instruction. Objection is made to the use of
the word "unshattered," for it is said that if a thing is
shattered it is destroyed, and if the decedent's mind was
shattered it was necessarily unsound. The word can have
no literal application to the mind as it may have to physical
objects. If mental perfection were necessary to make a will

the right of testamentary disposition of property would be destroyed. To make a will a mind absolutely sound is not required. (*Gregory* v. *Richey, supra; Speirer* v. *Curtis, supra.*) There was no error in giving the instruction. *Mc-Coy* v. *Sheehy, supra; Campbell* v. *Campbell,* 130 Ill. 466.

By the fourth instruction the jury was told that some testimony temporarily admitted had been later excluded and that the jury should not consider such testimony. Appellants assert that they do not know to what testimony the instruction refers, and appellees fail to point out the testimony stricken. Jules Gravelot, a witness, testified that the decedent had told him that a certain farm was to go to Olive E. Carlin. This testimony was stricken. On the next day, however, the witness was recalled and his former testimony was repeated. Testimony stricken should not be considered by the jury, and an instruction to that effect might properly be given. While a reference to the testimony to which the instruction applied might have been made by appellees, yet appellants do not show that they were prejudiced by the instruction. The jury would hardly apply the instruction to any testimony that had not been stricken.

The fifth instruction informed the jury that mental weakness or impairment of mental faculties is not inconsistent with testamentary capacity; that a less degree of mental capacity is required for the execution of a will than for the execution of contracts and the transaction of ordinary business; that one may be capable of making a will and yet be incapable of disposing of his property by contract or of managing his estate; that mental strength to compete with an antagonist and understandingly to protect his own interests is essential to the transaction of ordinary business, while it is sufficient for the making of a will that the testator understands the business in which he is engaged, his property, the natural objects of his bounty and the disposition he desires to make of his property. The

criticisms made upon this instruction are, that the phrase, "is not inconsistent with testamentary capacity," should be, "not necessarily inconsistent with testamentary capacity;" that no time is fixed at which the testator must understand "the business in which he is engaged;" that the instruction repeats elements contained in other instructions, and that it is argumentative. Mental weakness may be inconsistent with testamentary capacity, depending upon the degree of infirmity, but it is not necessarily so at every stage or degree. The adoption of the suggestion that the word "necessarily" be interpolated before the word "inconsistent" would make the instruction more accurate. But the second instruction correctly stated the law with reference to the test of mental capacity. The same instruction also informed the jury that it was to consider the mental capacity of the testator as of the time of the execution of the will. It is impossible to define the degree of mental capacity which a testator must possess in order to make a valid will, and it is not objectionable to mention certain conditions which, although showing impaired mental powers, are not sufficient to constitute incapacity to make a testamentary disposition. (*Speirer* v. *Curtis, supra; Blackhurst* v. *James,* 304 Ill. 586.) A reference to the different instructions discloses that while the same general rule of law was stated or recognized in several of them, different conditions, which might properly be called to the jury's attention and could not well be combined in a single instruction, were set forth in each instance. Neither the objection that certain elements were repeated nor that the instruction was argumentative can be sustained, for it does not appear that the jury was confused or misled or that appellants were in anywise prejudiced by the fifth instruction.

By the sixth instruction the jury was informed that if it believed from the evidence that the decedent at the time he executed the writing in question, on January 2, 1920, was of sound mind and memory, it was wholly immate-

rial what the jury might believe as to his soundness of mind at any other time. The directions to draw the will were given by the testator to his attorney on November 23, 1919. The attorney promptly drew the will but it was not signed by the testator until January 2, 1920. Appellants object that the instruction is erroneous because it does not appear that the testator understood the contents of the will when he signed it, and for that reason it is a material inquiry whether or not he was of sound mind and memory on November 23, 1919. The testimony is to the effect that the testator read the will on January 2, 1920. It was the day on which the will was executed and the time to judge of the testator's mental capacity. If he understood the contents and meaning of the will on that day, the fact that the instrument had been drawn nearly six weeks before is immaterial. But it is said that the instruction conflicts with the sixteenth instruction given at appellants' request, which stated that if the jury believed that at any time before January 2, 1920, the decedent was afflicted with senile dementia and that the affliction rendered him of unsound mind and memory at that time, and that such unsoundness of mind and memory was of a permanent nature, then in that state of the proof the law presumed that the unsoundness of mind continued until the contrary was proved. Different propositions of law were stated in these two instructions. One started with the premise that the testator was of sound mind on January 2, 1920, while the other presupposed unsoundness of mind as established prior to that time, and which, under the conditions stated, was presumed to continue. Both instructions were correct upon their respective assumptions, and there was, therefore, no conflict between them.

The seventh instruction related to the credibility of the witnesses and the weight to be given to their testimony, and it is criticised for its use of the masculine pronouns "he" and "his" in referring to witnesses generally. Two of ap-

pellants' witnesses were women and all the other witnesses were men. In the construction of statutes words importing the masculine gender may be applied to females. (Smith's Stat. 1923, sec. 1, sub-sec. 4, p. 2061.) Masculine terms are often used in a generic sense. Obviously, every person would understand that the two pronouns were so used in the instruction.

The eighth instruction told the jury that although the court permitted witnesses to testify to certain statements alleged to have been made by the decedent which were not in harmony with some of the provisions of the instrument, such statements were to be considered in connection with other evidence in the case only so far as they might tend to show the testamentary capacity of the decedent at the time he executed the instrument, and that the jury had no right to consider such statements for any other purpose. The instruction is criticised because, it is said, it singled out evidence, improperly used the words "testamentary capacity" instead of "testamentary incapacity," and led the jury to believe that the instrument was the last will of the decedent. William Friese, a witness, testified that the testator had told him on one occasion that he, the testator, intended to keep a particular farm for his daughter Olive. Frank Knecht, another witness, testified that he heard the testator make the remark that Olive was his favorite child, and that at another time, when they were talking about the distribution of property, the testator said if people would divide their estates more equally they would not be feeding the lawyers so much. The unequal distribution of property is not evidence of unsoundness of mind, but it may be considered as a circumstance, together with all the other facts and circumstances shown by the evidence, as tending to show unsoundness of mind. It was proper to instruct the jury upon the limited competency of the testimony. (*England v. Fawbush,* 204 Ill. 384; *Donnan v. Donnan,* 236 id. 341.) The use of the words "testamentary capacity" in-

stead of "testamentary incapacity" could not have misled the jury, for it was sufficiently advised of the issue in the case. The instruction referred to the will as an instrument, and nothing in the instruction could lead the jury to believe that the court assumed or stated that the instrument was established as the testator's valid will. Other instructions clearly stated that it was the jury's province to pass upon the validity of the instrument.

By the ninth instruction the jury was informed that even though it might believe from the evidence that there was some inequality of distribution by the instrument, no presumption, as a matter of law, was thereby raised against its validity, and that, standing alone, inequality of distribution was not to be taken as a circumstance against the validity of the instrument but was to be considered with all the other evidence in the case. Complaint is made of the instruction because, it is argued, it singled out evidence, and inequality of distribution did not stand alone in the case. If evidence is admitted for a particular purpose it is proper to confine its effect, by an instruction, to the purpose for which it is admitted or to state how it must be considered. (*Chaney* v. *Baker, supra.*) There was no error in giving the instruction. *England* v. *Fawbush, supra; Turnbull* v. *Butterfield,* 304 Ill. 454.

The tenth instruction informed the jury that the certificate of the oaths of the subscribing witnesses made *prima facie* proof of the validity of the instrument, and threw upon the contestants the burden of proving, by a preponderance of the evidence, that the testator was not of sound mind and memory at the time he executed the instrument. It is argued that the jury might not understand the meaning of the words *"prima facie"* or "validity of the instrument." The jury was to some extent assisted in understanding the meaning and extent of *prima facie* proof by the succeeding statement in the instruction itself. Proof of unsoundness of mind by a preponderance of the evidence,

the jury was told, would overcome the *prima facie* case. The jury could hardly infer that *prima facie* proof meant anything more than a legal presumption. The law presumes every person to be of sound mind, and when a will has been executed with the formalities required by law, the evidence of incapacity must clearly preponderate to authorize the setting aside of the will. (*Norton* v. *Clark*, 253 Ill. 557.) The phrase "validity of the instrument" is not a complicated expression, and, whether or not it is entirely self-explanatory, the chance of misconstruction is extremely slight. (*Grace* v. *Grace*, 270 Ill. 558.) Instructions of this character have been approved by this court. *Craig* v. *Southard*, 162 Ill. 209; *Egbers* v. *Egbers*, 177 id. 82; *Entwistle* v. *Meikle*, 180 id. 9; *Johnson* v. *Johnson*, 187 id. 86.

The twelfth instruction informed the jury that it had nothing whatever to do with adjusting or remedying any apparent unfairness or inequality in the disposition which the decedent made of his property by his purported will, if such was shown, and if the jury believed that when the decedent executed the writing as his last will he had sufficient mental capacity, as defined in the instructions, to make a valid will, then it was immaterial whether in the jury's opinion the will made a reasonable, just or unjust, judicious or injudicious, disposition of the property mentioned in it. It is objected that the instruction excluded from the jury's consideration, in determining whether the testator possessed the requisite mental capacity to execute a will, any unequal disposition of his property by the instrument. By the instruction inequality in the distribution of the testator's property would become immaterial only if the jury found that the testator had sufficient mental capacity, as defined in the instructions, to make a will. No inference would be drawn from the language of the instruction that an unfair or unequal distribution of the testator's estate could not be considered by the jury if it found that he did not possess the requisite mental capacity to make a testamentary disposi-

tion of his property. Such capacity, as the instruction stated, was defined in other instructions. When the instruction is read in connection with other given instructions, all of which were to be taken as a series, there could be no confusion or misunderstanding. The instruction correctly stated a rule of law. *Larabee* v. *Larabee,* 240 Ill. 576; *Chaney* v. *Baker, supra.*

The thirteenth instruction informed the jury that it was to try the case upon the law, the evidence and the presumption of sanity of the decedent. The criticisms upon this instruction are that it stressed the presumption of the decedent's sanity and tended to increase the burden of proof which rested upon appellants. The instruction was of a general character. Only one specific instruction upon the presumption of sanity was given, and it cannot be said that this presumption was unduly emphasized. Nor would the jury be led to believe that this instruction exacted from appellants a higher degree of proof than the law required.

The question of the alteration of the will, the jury was told by the fourteenth instruction, had been withdrawn from the case and should not be considered. The use of the word "will," it is argued, involved the assumption that the instrument was the decedent's will, when, in fact, the validity of the instrument was a controverted question. It would have been more accurate to have said "instrument" or "purported will." The instruction, however, did not relate to any issue in the case when it was given. In view of the series of instructions upon the issue of testamentary capacity the jury was not confused or misled by the fourteenth instruction.

Appellants insist that their offered twentieth instruction should have been given. That instruction informed the jury that although it might believe that the testator, at the time of making the purported will, had sufficient mental capacity to attend to the ordinary business affairs of life, yet if the jury further believed that with regard to subjects

connected with the disposition of his property by will and the natural objects of his bounty he was of unsound mind and memory, and that while laboring under such unsoundness of mind and memory he signed the alleged will, and in signing it was so far influenced or controlled by such unsoundness of mind and memory as to be unable, rationally, to comprehend the nature and effect of its provisions and was thereby caused to make it as he did, and if the jury believed that if he had been of sound mind and memory he would not have made the alleged will, then the instrument must be found not to be the testator's will. A similar instruction was held to be erroneous in *Noone* v. *Olehy,* 297 Ill. 160, because, as it was there stated, a person who has sufficient capacity to attend to the ordinary business affairs of life is usually possessed of such soundness of mind as the law requires for the execution of a will. There was no evidence in the instant case of insane delusions on the part of the testator. The instruction was properly refused.

The twenty-first instruction offered by appellants, it is argued, should have been given. By that instruction the jury was informed that the capacity to comprehend a few simple details, if the estate be small, might qualify a person intelligently to dispose of his property by will, while if the estate be large, requiring the recollection of many facts, the comprehension of many details and the disposition to be made is complicated, the same mental capacity might be wholly insufficient to the intelligent understanding of the business requisite to the making of a valid will. While this instruction may contain a correct statement of the law, it is open to the construction that the estate in question might require the recollection of many facts and the comprehension of many details. Although the testator's estate was large he could have had a very simple plan for its disposition. Nothing in the record shows that its testamentary disposition was necessarily complicated. The purpose of instructions is to inform the jury upon the rules of

law applicable to the facts which the evidence fairly tends to prove. (*Woods* v. *Chicago, Burlington and Quincy Railroad Co.* 306 Ill. 217.) An instruction which states the law correctly but in an abstract form, or is not so drawn as to be applicable to the facts of the case, is properly refused. *Dowdey* v. *Palmer, supra.*

It is insisted that the trial court erred in refusing to give appellants' twenty-second, twenty-third and twenty-fourth instructions. Each of the first two contains four tests of a person's competency to make a will, one of which is that he must know who are the natural objects of his bounty. A testator is only required to have the capacity to know who such persons are but it is not necessary that he actually know them. (*Dowdey* v. *Palmer, supra; Turnbull* v. *Butterfield, supra.*) The substance of the twenty-fourth instruction was contained in the ninth and twelfth instructions. The three instructions were properly refused.

Many of the incidents relied upon by appellants to show that the testator was mentally incompetent failed to have any important bearing upon that issue. They were rather the characteristics often exemplified by persons of advanced age. A number of witnesses, apparently disinterested, who had been acquainted with the testator for many years and whose opportunities for observing him were ample, testified that he was of sound mind. The evidence of a contrary character was not so convincing and the jury's verdict was clearly justified. While there were some inconsequential errors in the instructions, they are not sufficient to demand a reversal of the trial court's decree. *Britt* v. *Darnell, supra.*

The decree of the circuit court of Kankakee county will be affirmed.                                        *Decree affirmed.*