(No. 12189.—Reversed and remanded.)

HARRY DOWDEY *et al.* Appellees, *vs.* HELEN PALMER *et al.* Appellants.

*Opinion filed February 20, 1919.*

1. WILLS—*when financial condition of testator's children is not admissible.* In a proceeding to contest a will by which the testator has practically disinherited his children, evidence of the financial condition of the children is not admissible, where there is no proof that the testator knew of their condition.

2. SAME—*capacity to transact business is not the true test of capacity to make will.* The capacity to transact ordinary business is not the true test in determining whether the testator had sufficient mental capacity to make a will.

3. SAME—*true test of mental capacity to make a will.* The true test of mental capacity to make a will is whether the testator, at the time the will was made, had sufficient mind and memory to remember who were the natural objects of his bounty, to recall to mind his property and to make disposition of it understandingly, according to some plan formed in his mind.

4. SAME—*instruction directing a verdict must be supported by evidence.* In a will contest case an instruction directing a verdict for the contestants on the question of testamentary capacity should not be given where it contains hypotheses which are not supported by the evidence in the record.

5. SAME—*instruction directing a verdict should not give undue prominence to certain facts.* An instruction directing a verdict for the contestants should not be given where it singles out particular facts and calls the attention of the jury thereto without referring to other facts just as necessary for the jury to consider in reaching a verdict.

6. SAME—*capacity to comprehend the will is all that is required.* A testator, in order to execute a valid will, must have capacity to comprehend the same, but it is not necessary that he have "a full comprehension of the surrounding circumstances and of their direct consequences and probable results."

7. BRIEFS—*facts should not be mis-stated or exaggerated in the briefs.* In the preparation of briefs counsel should avoid statements with reference to the facts which are misleading, incorrect or exaggerated.

APPEAL from the Circuit Court of Rock Island county; the Hon. W. T. CHURCH, Judge, presiding.

JAMES F. MURPHY, and J. T. & S. R. KENWORTHY, for appellants.

MATTHEW J. McENIRY, FLOYD E. THOMPSON, and EDWARD L. EAGLE, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was a bill filed by appellees in the circuit court of Rock Island county to contest the alleged will of their father, J. H. Dowdey. The case was tried before a jury upon the question whether the writing produced was the last will and testament of the deceased, and the jury found that it was not, and upon that verdict decree was entered setting aside the instrument. From that decree an appeal was prayed to this court.

J. H. Dowdey was at the time of his death about fifty-two years of age. He had formerly been a farmer, living with his wife and children in northwestern Iowa, where he owned a quarter section of land. Some twenty years before his death he and his wife had domestic trouble, she charging him, as he claimed, with having committed some serious crime and procuring a divorce from him. At that time they had six children,—five boys and one girl. After the divorce the daughter and the baby son lived with the mother in a small town not far from the farm, while the four older boys for some years remained with the father.

He worked the farm with the aid of his sons and also
farmed several hundred acres of rented land near by, the
boys and their father keeping house for themselves. He
sold the farm some five or six years before his death and
resided for a time in Geneseo, Illinois. At first he boarded
and roomed there with a family who had formerly lived
near him in Iowa, and thereafter lived in a small house he
purchased, with the tenants to whom he rented the place.
After these tenants left he apparently had two boys, who
were engaged in the fruit business in Geneseo, living with
him. Later a widow, Fannie Torrence, came and kept
house for him. He moved to Rock Island, Illinois, Mrs.
Torrence going with him and still keeping house for him.
The summer before his death he and Mrs. Torrence lived
for a time in a houseboat on Rock river. In May, 1915, he
had a sickness which his physician, Dr. Lachner, diagnosed
as gall stones. After being treated Dowdey apparently got
over the acute attack and had no very serious trouble un-
til October of that year, when the pain recurred, and on the
advice of the doctor he decided to have an operation and
arrangements were made to have it performed at a hos-
pital in Rock Island. Before going to the hospital Dowdey
communicated with his sister, Mrs. Palmer, living in Ma-
quoketa, in eastern Iowa, and told her what he was going
to do, and as she herself was not well at the time and
could not go to Rock Island, she sent her daughter Helen,
the principal beneficiary under the will, and another daugh-
ter, to visit her brother at Rock Island. The evidence
shows that Helen and Mrs. Torrence went with him to the
hospital and remained there while the operation took place,
October 25. He apparently recovered in a few days from
the effects of the operation but about ten days after it was
performed he had an attack of lockjaw or tetanus, result-
ing, as the evidence shows, from the operation. He grew
rapidly worse and suffered greatly, as is frequently the case
with that trouble. After the attack of lockjaw his doctor

testified that he talked with him and told him that if he had any business he wanted to look after he should attend to it. As the result of this talk W. H. Palmer, the husband of the sister at Maquoketa, was communicated with by someone,—counsel for appellees contend by Mrs. Torrence,—and requested to come to Rock Island. Palmer came the same day he was notified, reaching Rock Island about nine o'clock in the evening, and with his daughter Helen and Mrs. Torrence went to the hospital, where, apparently by pre-arrangement with Dr. Lachner, Palmer went into the room where Dowdey was and had a short talk with him, as a result of which the testimony shows he went thereafter into the hall of the hospital, adjoining Dowdey's room, and drafted the alleged will. He then brought it into the room and read it over to Dowdey in the presence of the doctor and two nurses, who acted as witnesses to the will, Dowdey indicating that it was satisfactory to him. He was assisted to sit up in bed and with the assistance of the doctor signed the will, which was witnessed by Miss Gertrude Wagner, his regular nurse, and Miss Katherine Quinn, another nurse, who had been attending a patient in a near by room. Miss Wagner was not present at the time of the trial and her testimony was not before the jury, except her sworn deposition that was presented in the probate court when the will was probated there. In this deposition she testified that Dowdey was of sound mind and memory at the time the will was executed. The other attesting witness, Miss Quinn, and the attending physician, Dr. Lachner, testified at length on the trial, both stating positively that the testator was of sound mind and memory and in their judgment understood the contents of the will and what he was doing at the time it was drafted and when it was signed by him and attested by the witnesses. At the time the will was executed the evidence shows that the disease from which he was suffering had progressed to such an extent that his jaws were partially

locked and incapable of moving freely; that in consequence he experienced difficulty in speaking and articulated with hesitation; that during the time the will was being talked over he had a slight convulsion, and to relieve him the doctor gave him a few whiffs of chloroform, but all the witnesses present at the execution of the will testified that his mind was clear at the time, and there is no positive proof of any kind that any undue influence was used by anyone to obtain its execution.

The evidence shows, without contradiction, that in cases of lockjaw the mind is usually clear until death; that the convulsions incident to the disease are muscular, the patient suffering no particular pain except when the convulsions are actually present; that the locking of the jaws is peculiar to the disease, death being caused by the contraction of the throat muscles, the patient thereby smothering to death. The two nurses who were witnesses were in no way related to the testator or any of the parties in this litigation and were not made beneficiaries under the will. His attending physician testified that he had given the patient morphine about six hours before, but that in his opinion there were none of its effects present at the time the will was made.

There is a dispute in the record as to the value of the estate Dowdey left, appellants claiming that it was worth $40,000 while appellees contend that it was worth less than $30,000. He had contracted to purchase a house and lot in Rock Island worth about $2000 and he owned two pieces of real estate in Geneseo. What kind of property he owned other than this real estate does not appear clearly from the record. Under the will in question he left the real estate in Rock Island and Geneseo to his housekeeper, Mrs. Torrence, gave $2.50 to each of his five children, and the balance of his property he left to his niece, Helen Palmer, the daughter of his sister and of W. H. Palmer, who drew the will. He appointed Helen Palmer as executrix without bond.

Eight witnesses testified on behalf of the contestants and eight for the proponents of the will. No attempt was made by the contestants to question the mental capacity of the testator, and no evidence of any character was offered which showed directly positive fraud or undue influence in the execution of the will. If any evidence in the record tended to show fraud or undue influence it arose simply from such legal inferences as may be drawn from the fact that the father of one of the chief beneficiaries drafted the will and that the two chief beneficiaries were in an adjoining room at the time the will was drafted and executed and that the testator was seriously ill at the time. The evidence on behalf of proponents tended to show that in the last years of his life the testator did not feel kindly to his children because they had gone with the mother instead of remaining with him, and the testimony of several of the witnesses is to the effect that he said in their presence that he did not intend to leave any of his property to his children. The evidence also tends to show that his sister, Mrs. Palmer, was on very friendly terms with him and had visited with him often on his farm in northwestern Iowa and that he was with her more frequently than with any of the other relatives. The evidence on the part of the contestants tended to show that he had spoken in his last years in a way to indicate that he was on friendly terms with some, at least, of his children, and was very sorry that he had sold the farm and thus had been compelled to separate from his son Charles, who was living with him on the farm. One or two of the witnesses for contestants also testified that Mrs. Torrence took charge of some of Dowdey's business affairs during his last sickness and refused to follow his advice as to what was to be done with certain papers he had left with her and in other ways indicated that she did not carry out his wishes. Counsel. for appellees in their brief state that Mrs. Torrence and the testator had lived together, before his death, as husband and wife. We find

in the record no positive evidence indicating this relation between them. It is true that Mrs. Torrence was sometimes called Mrs. Dowdey, and they apparently lived together as the only persons in the house in Geneseo and in Rock Island, as well as on the houseboat. There is evidence, also, of one witness that on the day he went to the hospital Helen Palmer was visiting the testator at the houseboat and she asked him what he was going to do with his property after his death, and the witness did not hear the testator make any answer. There is testimony, also, that Mrs. Torrence stated, after he went to the hospital, that she was going to try to see that the property was left to her and the niece, Helen Palmer.

There is considerable discussion in the briefs as to whether or not Palmer, who drew the will, was a lawyer. There can be no question from the record that he was sent for by someone from Rock Island after the testator was attacked by lockjaw, and that he came with the intention of talking with the testator about drawing a will and did draft the will and was present at its execution. Whether he was a regular practicing lawyer or not we do not deem material as to any of the issues of this case.

There is also some discussion in the briefs as to whether the children were notified of their father going to the hospital and of the operation, and counsel for appellees argue that there was an attempt made by the beneficiaries under the will to keep from the children knowledge of their father's condition. Dowdey's sister testified positively that immediately after the operation she notified his divorced wife of the fact by letter and requested her to notify the children; that she wrote to the divorced wife instead of the children because she did not know the latter's addresses, and that she notified the divorced wife thereafter of his serious condition after the attack of lockjaw, with a similar request to notify the children. None of the children, however, came before the father's death, although the record

shows that the son Harry came after his father's death and took the remains back to the old home in Iowa for burial. We find no basis in the record to justify the argument of counsel for appellees that any of the beneficiaries under the will, or those who were present during the testator's last sickness, endeavored to keep any of his relatives or friends away from him during the last sickness.

Counsel for the appellants argue that the evidence of two witnesses was improperly admitted as to the financial condition of the testator's children. These two witnesses, Mr. and Mrs. Vandamore, had lived as neighbors to testator in Iowa and he had boarded with them for a time in Geneseo. This court has held that the financial condition of the heirs-at-law of a testator is admissible only when proof is made that the testator knew of their condition. No proof was attempted to be made in this case that the testator knew the financial condition of his children, and the evidence that the children were practically without property should not have been admitted. *Kern* v. *Meyer,* 264 Ill. 560; *O'Day* v. *Crabb,* 269 id. 123.

It is also contended by appellants that the court erred in permitting Mrs. Pearl Stafford, a former neighbor of the testator and who visited him in the hospital two days before his death, to testify, over objection, that she did not think he was able at that time to attend to ordinary business. It has long been the settled doctrine of this court that the capacity to transact ordinary business is not the true rule to govern when deciding whether the testator has sufficient mental capacity to make a will. The real question is whether, at the time the will was made, the testator had sufficient mind and memory to remember who were the natural objects of his bounty and to recall to mind his property and make disposition of it understandingly, according to some plan formed in his mind. (*Coleman* v. *Marshall,* 263 Ill. 330; *Ring* v. *Lawless,* 190 id. 520; *Taylor* v. *Cox,* 153 id. 220; *Sinnet* v. *Bowman,* 151 id. 146.) Counsel

287 − 4

for appellees concede that the ability to transact ordinary business is not the proper standard, but say that the same questions were asked of other witnesses by counsel for appellants, and that therefore appellants were not injured by Mrs. Stafford answering this question. We cannot agree with the argument that because improper evidence has been admitted on behalf of one of the litigants without objection the same sort of evidence can be admitted on behalf of the opposing party when objection is made to its admission.

Counsel for the appellants object to several instructions given on behalf of appellees, and we will here discuss instruction 6 given for appellees, which involves the question we have just been considering. That instruction reads:

"You are instructed that if it appears, from a preponderance of the evidence, that at the time the will in question was made J. H. Dowdey was on his death-bed, racked with pain and disease and feeble in mind and body from such sickness, and had not sufficient understanding and intelligence to transact his ordinary business affairs at the particular time he signed the purported will and to comprehend the transaction then in question, the nature and extent of his property and to whom he was giving the same, then he had not sufficient capacity to make a will, and you will find by your verdict that the writing produced is not his will."

It may be conceded that the testator was hardly in position, because of his bodily infirmities, to be able to transact his ordinary business affairs, as that phrase is ordinarily understood. There was no proof offered in this case of mental incapacity or feebleness of mind. On the contrary, all the evidence before us indicates that he was mentally bright until his death. While it is true the instruction connected the statement of inability to transact ordinary business affairs with his ability to comprehend the transaction in which he was engaged at the time he executed the will, the instruction directed a verdict partly on a basis of elements which were improper, and also completely ignored

evidence offered and relied on by appellants that tended to show that the will was prepared in accordance with the testator's directions, that it was read over in the presence of three disinterested witnesses who were in the room at the time, and that they all testified that his mind was mentally clear and that they believed he understood what he was doing in thus giving directions and executing the will. This instruction also ignored certain other facts relied on by appellants which should have been included in such instruction, as it directed a verdict. It contained elements as to the capacity to execute a will which are absolutely unsupported by evidence in the record, and therefore, under the reasoning of this court in *Norton* v. *Clark,* 253 Ill. 557, it was improperly given.

Counsel for the appellants also insist that instruction 5 given for appellees stated the law incorrectly and misled the jury. It stated, in substance, that if the testator was given a false impression concerning persons who were the natural objects of his bounty, so that when he came to make his will he acted upon this false information and gave or withheld his bounty in a manner entirely different from what his action would have been had it not been based on false beliefs deliberately instilled into his mind for the purpose of influencing him, the will would be invalid because of such undue influences. This instruction is open to criticism in that it assumes that the testator's actions were entirely different as to the provisions of this will than they would have been had they not been based on false beliefs instilled into his mind for the purpose of influencing him. It is also subject to the criticism that it does not state to the jury that their conclusions on this question must be based on the evidence. The instruction should not have been given.

Counsel for the appellants also insist that instruction 7 given for appellees was misleading. It is subject to the criticism that it seems to assume that the testator was feeble

in mind and body from old age when the proof was that he was between fifty-two and fifty-three years old, and while certain witnesses who had seen him stated that they thought he was about sixty years of age, there is no evidence in any way .contradicting his sister's testimony that he was fifty-two, and therefore at a time of life when it is generally assumed that a man is in his prime, so far as transacting business is concerned. It also is so worded that it might have led the jury to believe that the court thought the word "influence" should be treated as having the same meaning as "coercion," and there is not the slightest evidence in the case that tended to show, either directly or indirectly, that any coercion was exercised upon the testator in obtaining the execution of this will.

Counsel for appellants object strenuously to the prejudicial character of instruction 8 given for appellees, in that it attempts to direct a verdict and purports to set out the facts and circumstances upon which the jury would be justified in finding a verdict, but omits to set out or refer in any way to the facts and circumstances that are favorable to the contention of appellants. It is also misleading in assuming that the two principal beneficiaries under the will were present at the time it was signed. There is not the slightest evidence in the record which tends to show that Mrs. Torrence and Helen Palmer were in the room with the testator at the time the will was prepared and signed. From the way this instruction is worded it might tend to cause the jury to believe that the court considered that these persons were present at the time of the signing of the will, even though they were in the hall and not in the room itself. The instruction is also so worded as to justify the jury in assuming that the court, in giving the instruction, believed there was evidence justifying the conclusion that the absence of the testator's children at the time the will was executed was brought about by the appellants and that such absence tended to show undue influence. It was also

error to give this instruction because it selected certain facts as sufficient to sustain the verdict in behalf of appellees, without calling attention to other facts that were proved that were just as necessary to be considered by the jury in reaching a conclusion. This court has held that to select certain facts and call the attention of the jury specially to them is calculated to give undue prominence to such facts; (*McCartney* v. *McMullen,* 38 Ill. 237;) that if such a practice be approved it might result in permitting each party to ask an instruction on every item of testimony in the case and thus tend to confuse the jury instead of instructing them; that the jury are to consider all the evidence in the case in reaching a verdict and not give special attention to any particular facts. (*Callaghan* v. *Myers,* 89 Ill. 566; *Wickes* v. *Walden,* 228 id. 56.) Instruction 2 and certain other instructions of appellees are also faulty in this particular.

Instruction 9 given on behalf of appellees is erroneous in giving undue prominence to testator being an old man.

Instruction 10 given for the appellees is erroneous in stating that the testator, in order to have testamentary capacity, "must have had at the time a full comprehension of the surrounding circumstances and of their direct consequences and probable results." There is a marked difference between having a capacity to comprehend and actually comprehending. The law requires of a testator, in order to execute a valid will, that he shall have capacity to comprehend but does not require that he shall actually comprehend all that the will contains. In *Yoe* v. *McCord,* 74 Ill. 33, an instruction was held bad which stated that if the testator "did not know each and all of its provisions then it was not his will." In *Taylor* v. *McClintock,* 87 Ark. 243, it was stated (p. 273): "The question is, not whether the testator did actually appreciate the deserts of and relation to him of the one excluded, but whether he had at the time the capacity to do so. * * * Care, therefore, should

be taken by the courts to see that the distinction mentioned is observed, for it is precisely the one that public policy dictates and the law requires in order to preserve the right and power of testamentary disposition." In *Brown v. Mitchell,* 75 Texas, 9, the court held that it is not knowledge or understanding, but capacity to know and understand, that constitutes testamentary capacity; that it is necessary that a testator should know or understand what he is doing,—the nature of the business or act he is engaged in when executing his will,—but whether he knew of the facts necessary to give validity to it must be determined by his capacity to know and understand. In *Kerr* v. *Lundsford,* 2 L. R. A. 668, (41 W. Va. 659,) the court said (p. 678): "It is not necessary for a testator to actually have understood and recollected. If he was mentally capable of doing so it is sufficient." Beyond question, instruction 10, because of its misleading character in this regard, should not have been given. No man, even though in full possession of testamentary capacity, can with certainty know that he has full comprehension of the direct consequences and the probable results of his will. He may think he knows, but experience shows that the most far-sighted minds are often mistaken as to what they think will be the probable results of actions that they are taking.

Counsel for appellants earnestly argue that the court erred in refusing to give for them the following instruction:

"The court instructs the jury that the children have no legal or natural rights to their father's estate as against the provisions of a valid will, and that a parent, free from undue influence and of sufficient mental capacity, may give his property to any person he chooses."

This instruction states the law correctly but in abstract form. It was rightly refused because it was so drawn and was not made applicable to the facts in this case.

Counsel for the appellants argue at length and very earnestly that this cause should be reversed because the

evidence fails to support the verdict. They also sharply criticise the briefs of counsel for appellees on the ground that they contain many mis-statements of fact, enumerating some twenty-seven different instances in which they claim counsel for appellees have assumed that certain facts were shown by the record when the record gave no support for such an assumption. We find some support for this criticism, but we are disposed to think that the briefs of appellants are open, in some degree, to the same criticism. There should be no necessity to state that misleading, incorrect or exaggerated statements of facts in the briefs necessarily cause a court of review much additional labor in order to reach a correct conclusion on the issues, and may be harmful, rather than helpful, to the litigants in whose behalf such briefs are filed. In view of the facts in this case and the conclusions we have reached as to the erroneous rulings by the trial court, and because this case must be tried again, we do not care to express an opinion as to the evidence in this record, except to say that it is of such a nature that it was essential that the jury should be accurately instructed. *Wabash Railroad Co.* v. *Henks,* 91 Ill. 406.

Several other questions were raised in the briefs which we do not consider it necessary to discuss, except to say with reference to the claim of counsel for appellants that there is a variance between the allegations and the proof, that we think the allegations in the bill, if there had been no error committed on the trial, would justify the affirmance of the decree.

The decree will be reversed and the cause remanded for further proceedings in harmony with the views herein expressed. 　　　o　　*Reversed and remanded.*