DUTEE WILCOX FLINT *vs.* PAUL C. NICHOLSON *et al., Ex'rs.*

APRIL 14, 1942.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

BAKER, J.   This action of assumpsit was tried in the superior court before a jury which returned a verdict in favor of the plaintiff for $1,033,338.21.  Thereafter the defendants' motion for a new trial was granted by the trial justice.  To that decision the plaintiff has duly prosecuted his bill of exceptions to this court.  The defendants also have prosecuted their bill of exceptions to certain rulings made by the trial justice during the course of the trial in relation to the admission and exclusion of evidence and to other matters; to certain portions of the charge to the jury; and to the refusal of the trial justice to charge as requested by them.  The case is now before us on the bills of exceptions of both parties.

It appears from the record herein that Samuel M. Nicholson, familiarly known as Colonel Nicholson, died April 7, 1939, leaving a will which was admitted to probate in Providence. The defendants are the duly qualified executors under that will. On June 8, 1939 the plaintiff filed in the probate court his claim against the estate of said Samuel M. Nicholson. That claim, which is the basis of this case, was disallowed by the defendants November 17, 1939, and the instant case was brought by the plaintiff November 28, 1939. It is based on a certain promissory note reading as follows:

"New York October 15th 1937

On demand after my death I promise to pay to Dutee Wilcox Flint, or order, One Million Dollars, without interest. This note is given to Dutee Wilcox Flint in return for invaluable services which he has rendered to me.

(Seal) Sam'l. M. Nicholson"

The plaintiff's declaration contains two counts. The first is in the usual form declaring on a promissory note. The second is on a "writing obligatory" under seal. The declaration does not contain the common counts. To the first count the defendants pleaded nonassumpsit and a second plea setting out, in substance, that they did not owe the sum of money or any part thereof as alleged in the said first count. To the second count the defendants filed seven pleas each containing a separate defense to the said supposed writing obligatory.

Among such defenses were that the said instrument was not that of said Samuel M. Nicholson; that it was not his deed; that it was obtained by the fraud and by the undue influence of the plaintiff practiced and exercised on said Samuel M. Nicholson; and that there was no consideration to support the latter's alleged promise as contained in said supposed writing obligatory. Certain of these pleas were traversed by the plaintiff and the record shows that the pleadings were otherwise duly closed. The defendants also gave the plaintiff notice that he would be required to prove the signature on said alleged instrument in writing.

In view of the conclusions reached by us, as hereinafter set out, it becomes unnecessary to discuss all the facts appearing in evidence. We refer to them, therefore, only in so far as they apply to the exceptions considered and as they may be of aid in furnishing a general outline of the transactions involved. We do not in any way attempt to pass upon the weight of the evidence.

From the evidence it appears that when the note in question was executed the plaintiff was fifty-four years old and Colonel Nicholson was then something over seventy-six years of age. Prior to 1929 the plaintiff had been a very successful distributor of a popular make of automobile, having control of agencies in several states. He was also, during part of that period, interested in a gasoline and oil business. Colonel Nicholson, who was married and had a son and a daughter, was for many years before his death prominent in the business and industrial life of Providence where he lived, being financially interested in and an officer of several large corporations. He was a man of wealth and had a social position in that community. Both men enjoyed yachting and this proved a source of mutual interest.

The plaintiff first met the colonel in 1905 in relation to business matters. The latter soon became interested in the plaintiff, then a young man just starting as a distributor of automobiles. As time passed they became more friendly, their business connection expanded and gradually a social relationship developed between them. During the period from 1918 to 1930 the two men became closer friends. The plaintiff was occasionally a guest at Colonel Nicholson's home, dined with him there, on their respective yachts and in other places, traveled with him to New York on business and saw him with greater frequency, particularly during the yachting season.

Between 1925 and 1930 they corresponded often on matters other than business. During that period the plaintiff made many gifts to the colonel, some apparently of considerable value. By 1928, however, the former experi-

enced serious financial difficulties, and the crash of 1929 vitally affected him, sweeping away his business and practically all of his fortune.

Colonel Nicholson, who apparently was not seriously affected by the depression of 1929, was fully cognizant of the plaintiff's financial and business difficulties and, at that time, assisted him in obtaining loans. Evidently he also desired to help the plaintiff in getting a new start, and, to that end, in January 1930, he gave a dinner at his home in honor of the latter, inviting as guests a group of intimate friends then prominent in the business and financial life of Providence. The plaintiff testified that he was asked by Colonel Nicholson to come to the dinner early and that he did so and was taken by the colonel into the conservatory of his home in order that they might have a "serious" talk. The plaintiff testified further that Colonel Nicholson then said: "Dutee, I need some one that I can trust and some one that I can have the first call on their time, and some one that I can talk personal matters over with and I also want some one that can stick with me—stick with me through thick and thin to the end, and if you will do that I will see that you are well taken care of financially." In answer the plaintiff said: "I shall be glad to do that", whereupon the colonel replied: "That is all right. That is an agreement. We will agree to it."

For the following three years there apparently was no material change in the relationship of the two men. During this period the plaintiff was conducting a garage and service station with indifferent success. In the late summer of 1932 Colonel Nicholson had an attack of illness from which he recovered, but apparently he did not seem to be as well as he had been previously. In the fall of 1934 he had another ill turn. He continued, however, to attend to business matters and to take winter trips to the south with friends, each trip usually lasting several weeks. After the plaintiff's home burned in December 1932 he and his wife and daughter lived at a hotel. The colonel soon

began to call on the plaintiff there, in the middle of the day, to rest and to take luncheon with him and he continued this practice in 1934 and 1935.

In January 1936 it was discovered that the colonel had cataracts on both eyes, one complete and one slight. In February of that year he had two more attacks of illness, one at a business meeting and one while traveling with friends. On both occasions he became unconscious for a time. It was testified that following these occurrences he required help in walking; that his speech was somewhat affected; that he had lost control of certain bodily functions and that he was feeble and at times irritable. During this period the plaintiff was with Colonel Nicholson a great deal and frequently read to him.

In October 1936 an operation was performed on the colonel's eyes in a hospital in Boston, with the result that his eyesight was restored in one eye but not in the other. The plaintiff helped to arrange for this operation and remained in the hospital with Colonel Nicholson for ten days after it was performed. The latter then returned to his home in Providence, taking a nurse with him. From then on until his death in April 1939 he always had a nurse in attendance. After leaving the hospital Colonel Nicholson paid the plaintiff $1500 in four payments. The testimony is conflicting as to why this money was paid.

After this the plaintiff apparently was with the colonel often. He accompanied him on trips to Havana in January and April of that year, making all the necessary arrangements, looking after all details and waiting on him personally. There was evidence that at this time the colonel could not dress or shave himself and had to be assisted in other respects. All the expenses of these trips were paid by Colonel Nicholson.

In May 1937 the plaintiff, at Colonel Nicholson's request, leased a cottage in Newport, and the latter lived there with the plaintiff and his family for a month or more. The colonel then spent most of that summer on his yacht, going

to Providence frequently. At the end of the summer he again visited for a short time at plaintiff's cottage in Newport. On September 4, 1937 the colonel, the plaintiff and a nurse went to Havana. They returned to New York by steamship, arriving October 15, 1937, and plaintiff testified that on that date the note in question was signed by Colonel Nicholson on said steamship while it was in New York harbor.

Concerning the facts leading up to the drawing and signing of the note the plaintiff testified in general as follows: One evening in August 1937, in the plaintiff's cottage in Newport, while the two men were alone, Colonel Nicholson, after saying that the plaintiff had carried out his part of their agreement, said: "Dutee, we are going to Havana on September 4th and before we go I want you to get something in writing that I can sign that will bind my estate after my death and get a draft of it and bring it to Havana and I will sign it in Havana." The amount to be paid by his estate was not then discussed, nor was the nature of the contemplated instrument. The colonel also asked that the matter be kept confidential. The plaintiff said he would draw up such an instrument, and subsequently, after consulting a Providence attorney as to what kind of an instrument could then be executed so as to be payable after the colonel's death, he drew up the note in question.

The matter of the note was not discussed further by the two men until shortly before they started back to New York. Colonel Nicholson asked the plaintiff if he had drawn the necessary document. The plaintiff said that he had a draft of a note payable after death and he read this to the colonel, who approved it. In response to a question from the plaintiff the colonel said the note should be typewritten. The plaintiff then bought some plain paper in a store in Havana after attempting to obtain a form for a note. On the trip to New York on October 14 Colonel Nicholson told the plaintiff to type the note and have it ready when they reached that city. The latter asked for

the amount to be inserted in the note and the colonel said in view of taxes to make it out for $1,000,000. No other person was present at any of these conversations.

The plaintiff typed the note on his own typewriter on the morning of October 15 in his stateroom adjoining the colonel's. At this time the latter was in his stateroom alone and asked to see the note. He had his glasses on and after the plaintiff had read the note to him the colonel took it and read it also. He asked that a line be placed on the note for his signature, and the plaintiff did so by inserting the instrument again in the typewriter and making a series of dots or dashes. The plaintiff then went back to the colonel's stateroom with a blotter pad and handed the note to Colonel Nicholson, who read it again. The pad was then placed in the colonel's lap and he signed the note with the plaintiff's fountain pen without further comment. The plaintiff then placed the note in his pocket and said: "Thank you, Colonel." No other person was present during this proceeding.

The note was thereafter placed in a safe in the plaintiff's office in Providence and later in a deposit box in a bank in that city. The only persons whom the plaintiff told concerning the execution of the note were his wife, his brother and his secretary. On October 24, 1937 the plaintiff consulted a New York attorney, who was doing some work for him on another matter, as to whether he should take any further steps to protect himself in connection with a note payable after the maker's death. The attorney was not informed as to the name, amount, or other details. Later the attorney advised the plaintiff that, since Rhode Island was a common-law state, he might be further protected if the maker put a seal on the note. Thereafter, on November 3, 1937, in Newport the plaintiff suggested to Colonel Nicholson, while the two men were alone, that the latter place a seal on the note which the plaintiff had brought, together with some seals, from Providence.

The colonel then moistened a seal and placed it on the instrument.

For the greater part of the time from October 15, 1937 to February 1938 Colonel Nicholson lived with the plaintiff and his family at their cottage in Newport, coming to Providence occasionally with the plaintiff and a nurse. His own family was living in Providence during this period. In February 1938 the colonel, the plaintiff and his wife, and a nurse again went to Havana where all but the plaintiff remained until April 9, 1938. The latter, however, in the meantime, went back to New York to attend to some business, but returned to Havana in time to sail for New York with the colonel.

While the plaintiff was in New York in March 1938 he again consulted the same attorney from whom he had received advice in the previous October. On this second occasion he showed the attorney a pencil copy of the note and asked if he could do anything more to protect himself in the matter. The attorney suggested that a letter should be signed by Colonel Nicholson explaining why the note had been given. A draft of a letter was then prepared and was taken away by the plaintiff.

Thereafter the plaintiff typed the letter in Providence on a sheet of ordinary typewriting paper. The plaintiff testified that, knowing approximately the time when the colonel would return from Havana he dated the letter accordingly. Nothing was said to Colonel Nicholson in Havana about this letter, but on the steamship returning to New York the plaintiff told him of the advice given by the said attorney in reference to a corroborative letter. The colonel read the proposed letter and suggested that they talk about it the next day.

The plaintiff took the matter up with Colonel Nicholson again on April 12, 1938, the day the steamship arrived in New York. The latter was sitting in his stateroom ready to leave the steamer. The plaintiff read the letter to him and he expressed his approval. He did not have his eye-

glasses and asked the plaintiff to see the nurse about them. The plaintiff found the nurse on deck and asked her to go to the colonel's cabin. She did so, procured the eyeglasses and helped him to put them on. A blotter pad, which the plaintiff had obtained, was placed in the colonel's lap, and the letter was then signed by him with the plaintiff's fountain pen. In accordance with the advice of the New York attorney the letter was placed at an angle so that the signature would pass through the date which was at the end of the letter. The nurse testified, in substance, that she was present when a paper of the above description was signed, but she did not place her name on it as a witness. After the signing plaintiff took the letter, eventually placing it in his office and later in the safe deposit box where the note was kept.

The letter above referred to reads as follows:

"En Route Havana to New York
Dutee Wilcox Flint,
    Providence, R. I.
Dear Dutee,

    You have asked me to write you a letter which you could show if anybody asked the reason for my giving you a note last October for one million dollars.

    Should anybody ask the question, this letter will make it clear that I was merely carrying out a promise of many years duration to compensate you eventually for all the time, care and trouble that you devoted to me during those years and that I knew you would continue to devote to me during my few remaining years.

    So, if anybody wants to know, let them read this letter.

Yours sincerely,
Sam'l M. Nicholson
April 11th 1938"

About June 1938 Colonel Nicholson had another attack and apparently thereafter walked with great difficulty and at times had to be carried. In August 1938 he went on

another trip to Havana with the plaintiff and his daughter, two women nurses and a male nurse. Upon returning to Newport late in that month the colonel was in such a condition that his wife employed certain doctors to examine and attend him. He remained on his yacht until October 1938 when he was taken to his home in Providence, where he later died. While he was in Providence the plaintiff visited him often.

Colonel Nicholson left a will, executed November 18, 1931, leaving nearly all his estate to his wife, son and daughter. The plaintiff was not mentioned in the will. The colonel's family apparently had no direct knowledge concerning the execution of the hereinbefore-described note and letter. About August 1938 it would appear that some of his friends heard a rumor in relation to these matters. The plaintiff was questioned by some of those friends, but declined to answer on the ground that it was a matter between the colonel and himself. In October 1938, according to the testimony of Colonel Nicholson's son, the latter asked his father if he had signed any paper for the plaintiff or obligated himself to him for the payment of money, and the colonel denied doing so.

We have considered the defendants' bill of exceptions which contains a large number of exceptions, most of which are now being pressed. However, we see no reason to pass upon all of said exceptions at this time because we have found that certain of them are valid.

At the conclusion of all the evidence the defendants moved that the trial justice direct a verdict for them on the second count of the declaration. This motion was denied, as were two requests to charge relating to the same general matter. The defendants duly excepted to these rulings. In support of their motion they urged that there was a variance between the second count of the declaration and the proof in support thereof. It appeared that, at the defendants' request, the plaintiff, before trial, had filed a bill of particulars which clarified the situation as to this

count. Upon the record before us we find no such material variance as would warrant the trial justice in taking away from the consideration of the jury the plaintiff's second count. Further, in our opinion, provisions of the negotiable instruments law, G. L. 1938, chap. 455, § 12, do not furnish a valid ground for the defendants' contention that the trial justice should have directed a verdict in their favor as to said count. He did not err, therefore, in his ruling on this point, and defendants' sixty-sixth and sixty-seventh exceptions are overruled.

As to the requests to charge with respect to the effect of the seal upon the instrument in question, we have given such requests consideration, and find that the first is too broad in its scope and that the second contains matter which is erroneous and which, in our judgment, would tend to confuse the jury. In our opinion there is no merit in the defendants' exceptions to the ruling of the trial justice in refusing to grant these requests, and defendants' one hundred fourth and one hundred fifth exceptions are overruled.

During the trial the defendants introduced in evidence a certified copy of the will of Colonel Nicholson and of the probate inventory of his estate. This inventory showed that the amount of his personal estate was approximately $3,230,000. This evidence, it would tend to appear from the record, was introduced by the defendants in order to form the basis for an argument that the making of the note was improbable, on the ground that it was disproportionate in amount to the total personal estate left by the deceased, being almost one-third thereof.

Thereafter, in cross-examination of Paul C. Nicholson, the colonel's son, the plaintiff was permitted, over the defendants' objection, to put in evidence the approximate amount of the witness's estate in 1937, namely, something over $1,000,000, and also his net income, before taxes, for that year, amounting to $116,000. Later, during the cross-examination of Colonel Nicholson's secretary, the plaintiff was permitted, over the defendants' objection, to

show the net income, before taxes, of Colonel Nicholson's wife for the years 1936 and 1937, approximately $90,000 for each year, and also to show the full value of her estate in 1937, that is to say, upwards of $1,600,000. The plaintiff contended that this evidence was relevant and proper in view of the fact that the defendants had shown the amount of the colonel's personal estate for the purpose above indicated. The defendants, however, argued that the evidence to which they objected was not relevant to the issues in the case, and was introduced to prejudice them by showing that the wife and son of Colonel Nicholson were also wealthy.

In *Paradise* v. *Rick*, 63 R. I. 207, an action against an executor for the value of certain services rendered by the plaintiff to the testatrix, the plaintiff, over the defendant's objection, offered in evidence the probate record of her estate. The trial justice admitted the record and this court, in holding that he did not commit prejudicial error in so doing, stated at page 209 of the opinion: "The admission of such a record in a case of this kind should be allowed with caution. There are cogent reasons in support of defendant's contention that the jury should not be permitted to take into the jury room such a record containing irrelevant and immaterial items which might tend to prejudice their minds and perhaps lead them astray from the true issue or issues of fact submitted for their determination. The instant case, however, presents certain issues concerning which the probate court record cannot be said to be wholly irrelevant and immaterial." The court also pointed out that the trial justice had carefully and specifically instructed the jury as to the purpose for which the record was being admitted and that they should consider the record only in that connection. And finally, the court held that, as to such record, no inflexible rule of admission could be safely laid down, saying at page 210: "Each situation must be dealt with as it arises on its own peculiar circumstances."

These general principles, in our judgment, apply equally in the instant case, although it is brought on a signed

instrument involving the payment of a definite sum of money, and not for the fair value of services. The fact that the defendants themselves in this case put in evidence a copy of the will of Colonel Nicholson and a copy of the inventory of his estate undoubtedly permitted the plaintiff to cross-examine as to relevant and material matters connected with such probate records and with the colonel's own finances. This action by the defendants, however, would not in itself permit the plaintiff to cross-examine as to the value of the estate of Colonel Nicholson's wife and of his son in 1937, and as to their respective incomes at that date.

As raised by the pleadings and by the evidence, the issues in general were whether or not the instrument in question was the act of Colonel Nicholson and, if so, whether he was of sound mind when it was executed; whether it was obtained from him by the fraud or undue influence of the plaintiff; and whether it lacked consideration. However, in view of the fact that the defendants themselves introduced into the case the amount of Colonel Nicholson's estate, and of their apparent purpose in so doing, as hereinbefore set out, the evidence of the value of the holdings of the colonel's wife and of his son in 1937, and of their respective incomes at that time, would become relevant and material to certain issues in the case if, but only if, knowledge of these facts was established in Colonel Nicholson as of the time of the signing of the note. If such knowledge was so established then the evidence in question might, to some extent, tend to rebut the defendants' argument that the execution by Colonel Nicholson of the instrument was improbable, considering its proportion in relation to the amount of his personal estate, and having in mind the natural objects of his bounty, and might also bear on the issue of whether fraud or undue influence was exercised upon him by the plaintiff, or whether the colonel acted freely and naturally under all the circumstances.

It is clear, therefore, that before such evidence was ad-

missible the plaintiff must show that Colonel Nicholson at least had knowledge in October 1937 of the amount of the respective estates and incomes of his wife and son. See *Dowdey* v. *Palmer*, 287 Ill. 42; *In re Estate of Burgin*, 186 Iowa 928, where the above principle was applied in will contests. There is in the present case some evidence tending to show that at the above time Colonel Nicholson had general knowledge of the amount of the estate and income of his wife. But there is no evidence that he had any knowledge of the extent of his son's estate and income. The plaintiff contends that by reason of the intimacy of the father and son, their association as officers in the same corporation, the proximity of their respective offices and other like circumstances, it is necessarily to be inferred that Colonel Nicholson had full knowledge in 1937 of his son's estate and income.

While the colonel may have been acquainted, to some extent, with his son's manner of living, and may have known in a general way that he had a good income, nevertheless there is no evidence here that the colonel had sufficient knowledge of the amount of his son's estate and income to form the basis for admitting the evidence under consideration. The plaintiff's contention that Colonel Nicholson must have had such knowledge is not based on evidence but rests only on speculation or surmise. We find, therefore, that the admission of the evidence relating to the amount of the son's estate and income was error. Further, by reason of the nature of this case, which is an action against executors in their representative capacity, the admission of such evidence, in our opinion, was prejudicial to the defendants; and the later specific reference thereto in the charge, as hereinafter discussed under another exception, emphasized the prejudice. Therefore, the defendants' sixteenth and seventeenth exceptions are sustained; but those numbered twenty-eight to thirty-five, inclusive, and the sixty-second exception are overruled.

The defendants, by their bill of exceptions, raise certain

questions in connection with the charge to the jury. After referring to plaintiff's testimony regarding the making of said alleged agreement in January 1930, the trial justice charged as follows: "The defense has attempted to combat the effect of that testimony by producing the testimony of Mr. Henry G. Clark. Now Mr. Henry G. Clark testifies about an event. He testifies in 1940 about an event that is said to have occurred in 1930, and so far as the circumstances here show, he had no particular reason for observing what took place at that time." The defendants excepted to the above portion of the charge on the ground that it constituted unfair characterization of the witness Clark's testimony on an important issue in the case.

In considering this exception it should be remembered that plaintiff's case rested upon the alleged agreement as the foundation upon which he based the consideration for the instrument in suit. The existence or nonexistence of such agreement, therefore, was vital to the plaintiff's case and of great importance to the defendants.

The plaintiff testified positively, as previously stated, that he and Colonel Nicholson went together into the conservatory of the latter's home just before the guests went in to dinner and that the alleged oral agreement, hereinbefore referred to, was entered into then and there; that he had performed certain services as called for by such agreement; and that he had received the instrument in suit as consideration for such services. He further testified that no person other than Colonel Nicholson was present at the making of said alleged agreement.

Colonel Nicholson, of course, was dead at the time of the trial. This made it necessary for the defendants to meet plaintiff's testimony by circumstantial evidence, bearing upon the alleged making of such agreement and upon the credibility of the plaintiff. Defendants presented Henry G. Clark as a witness on this issue. He testified, among other things, that he was an intimate friend of Colonel Nicholson; that he was in the colonel's home on the evening in question,

in January 1930, when the dinner was given in honor of the plaintiff; that he, at the colonel's request, had assisted in arranging for this dinner and in greeting the guests as they arrived. He further testified positively that he was present in the library where all the guests, including plaintiff, assembled for cocktails before dinner; that the conservatory was entered from the library and that the doors thereof were open at all times; and that the plaintiff and Colonel Nicholson certainly did not go together, at any time before dinner, into the conservatory, at which place and time the plaintiff had testified that said alleged agreement was entered into.

As bearing upon the weight and credibility of Clark's testimony, the trial justice might properly have called to the jury's attention, for their consideration and determination, the evidence on the questions whether or not, under all the circumstances, the witness had any particular reason for observing what took place before the dinner, and whether he correctly testified to what actually did take place. The trial justice, however, did not do this; but he substantially took the determination of such questions from the jury when he told them definitely that "so far as the circumstances here show" the witness "had no particular reason for observing what took place at that time." Plainly this was not only a comprehensive conclusion of the trial justice, but it also seriously affected an appraisal of the witness' credibility. As a matter of fact, the evidence shows that the witness had testified, in substance, that he remembered the details leading up to this dinner in honor of plaintiff because he had assisted, at Colonel Nicholson's request, in arranging for it, in greeting the guests, and in moving among them in the library before dinner was served; and that he had then observed certain things that took place, even though, as he later said in cross-examination, he had no reason to keep plaintiff under particular surveillance.

The instant case comes within the general principles which govern a trial justice when he charges a jury with reference to the evidence. Although each case may call for a different

application of these principles to the particular facts and circumstances therein, the general principles themselves have been set out and substantially followed in both civil and criminal cases. See *Pompei* v. *Cassetta*, 63 R. I. 74; *Scott* v. *McGroarty*, 48 R. I. 79; *State* v. *Gallogly*, 47 R. I. 483. While the case last cited is a criminal one, it nevertheless contains a discussion of certain principles underlying the duty of a trial justice in charging a jury and those principles are applicable in the case at bar. The court, at page 486 of its opinion in the *Gallogly* case, stated: "Therefore, while it is the right and often the duty of the trial justice, in the exercise of his discretion, to state to the jury not only the issues but also the testimony and other evidence bearing upon the issues—see § 4640, G. L. 1923—he should always be exceedingly careful not to deprive either party of a fair trial by either consciously or unconsciously conveying to the jury his impression as to the proper weight to be given to any of the testimony." (See G. L. 1938, c. 496, § 20.)

The language of the charge under consideration in the instant case is not of the same nature as that before the court in *Reynolds* v. *Davis*, 55 R. I. 206, or in *Desautelle* v. *Nasonville Woolen Co.*, 28 R. I. 261, and the discussion of the pertinent legal principles in those two cases does not support the plaintiff's contention that the above language in the instant case was proper.

The practical effect of the charge as given was to deprive the defendants of an opportunity to have the jury determine, upon all the evidence and not upon the trial justice's conclusion thereon, whether or not the witness Clark had any particular reason "for observing what took place"; whether the things he said he observed actually did take place; and whether his testimony and credibility were entitled to greater or lesser weight on this issue than the testimony and credibility of the plaintiff. On such an important matter, the portion of the charge in question went beyond any proper reference to the evidence which the trial justice was entitled to make,

and in our opinion this constituted prejudicial error. The defendants' seventy-fifth exception is therefore sustained.

The defendants' seventy-ninth exception is to the following portion of the charge: "Now a great deal of argument has been made here because of the size of this supposed obligation. I want to say to you don't be particularly deterred by the size of it. The size of it is only comparative. You are to think of what Colonel Nicholson's fortune was at that time, what his relations to his family were, what their fortunes were at that time, because the argument against a large amount of money is predicated fundamentally upon the thought that it is doing wrong to those whom Colonel Nicholson should leave behind him. It wasn't going to take a nickel from Colonel Nicholson in his lifetime but only at his death from his estate and naturally, and as the event proves, that would come out of the pockets of the members of his family. And that is why the evidence was admitted with respect to the wealth or want of wealth of Mrs. Nicholson. There is some testimony here that she had an estate of about $1,600,000, and that around this period she had an income of something between $80,000 and $90,000 a year. There is testimony here that Mr. Paul Nicholson had an estate of something over a million and that he had an income of something over $100,000 a year and that at the same time Colonel Nicholson's own income was something in the neighborhood of $400,000. Now all those things bear upon the reasonableness of the plaintiff's claim, and you are to give them due weight in that connection."

The defendants' exception was on the ground that the trial justice made the above-quoted references to certain facts without telling the jury "that the existence of all that money should not in any way prejudice their consideration of the case, if they found all the facts in the defendants' favor." While certain of the above matters referred to in the charge possibly had some relation to the questions of whether or not Colonel Nicholson signed the note in suit and, if so, whether or not he was unduly influenced by the plaintiff, we are of

the opinion that the trial justice, in view of his extended and detailed remarks on the subject, did not adequately deal with all phases of the point under consideration, and that his charge was open to the objection that, as to such point, it was incomplete.

Out of fairness to the defendants, and in order that the jury might not misunderstand the situation, he should have pointed out to them in some suitable language that in their consideration of the issues the existence of the wealth in question should not, in and of itself, operate to the prejudice of the defendants. This he did not do, although the exception was taken in the form indicated immediately after the charge had been given and before the jury had retired to consider the case. In our judgment the failure of the trial justice to fully cover the point was prejudicial error, in view of all the circumstances and of the nature of the case. In our opinion the defendants' seventy-ninth exception should be sustained.

In support of their defense that Colonel Nicholson was of unsound mind on October 15, 1937, the defendants presented the testimony of numerous witnesses who gave their opinion as to his mental condition on that date. They also testified as to his conduct, statements, and general physical condition and appearance at or about that time. Certain of these witnesses were his employees in various capacities, and others were persons with whom he had contact more or less frequently. Many of them were intimate and long-standing friends of his, some of them being more or less closely associated with him in the conduct of various corporations in which they and the colonel were interested.

In referring to the testimony of such of the witnesses last mentioned as were codirectors and officers with Colonel Nicholson in certain corporations, the trial justice in his charge used the following language in connection with the weight to be given the testimony of each of them: "Now, if he knew at the time that the man was of unsound mind and voted for him, it is a reflection upon his credit and by his

credit I mean it is a reflection upon the weight of his testimony and you are entitled so to regard it. If, on the other hand, he had no opinion at all at the time the event occurred and when asked in court about it expresses an opinion which he transmits from now to then, well, you will take that into consideration. Perhaps that is the most charitable way to look at it. The sympathies of these people are mixed up in this case to some extent, or at least you may find that their— perhaps that is the kindest way to look at their testimony, that at the time they may or may not have had an opinion but if they had an opinion and voted against their duty, that affects their credit. If they had no opinion at the time and their sympathies now induce them to come here and project their present opinion back to that time, and why, you will take that into consideration. At any rate, I call these matters to your attention merely for the purpose of enabling you to judge of the value of the testimony, and you are to be the judges of that testimony."

The defendants excepted to the above language on the ground that it substantially directed the jury as to how they should consider the testimony of the witnesses in question. Although the trial justice undoubtedly had the right to call to the jury's attention matters of fact in the evidence which bore upon the weight to be accorded to the testimony of the witnesses in question, nevertheless, in our opinion, a portion of the above-quoted language was objectionable. While it may not have amounted to a direction, as the defendants contend, in our judgment it plainly indicated to the jury that the trial justice was of the opinion that the testimony of such witnesses was of little or no weight. We refer in particular to the following statement of the trial justice: "Perhaps that is the most charitable way to look at it. The sympathies of these people are mixed up in this case to some extent, or at least you may find that their—perhaps that is the kindest way to look at their testimony . . . ."

Under all the circumstances, the defendants had the right to have their defense of the unsoundness of mind of Colonel

Nicholson submitted fairly, in the first instance, to the jury for their determination. It was not within the province of the trial justice to indicate to the jury in his charge his views as to the merits of that defense on the evidence submitted, or as to the weight and credibility to be given the testimony of certain witnesses in that connection. His opportunity to express himself as to such matters would come when he passed on the motion for a new trial, if such a motion was made and heard.

In *Pompei* v. *Cassetta, supra,* the court, at page 77, said: "The trial justice under our law is not authorized to express in the charge his own opinions on the evidence or to give his own characterization of any witness." The fact that the trial justice, in terminating the portion of the charge in question, made a general statement that the jury were to be judges of the testimony does not, in our opinion, under all the circumstances herein, eradicate the effect of the specific language used by him theretofore. See *State* v. *Gallogly, supra.* The defendants' eighty-fourth exception is therefore sustained.

Because of the above findings, we deem it unnecessary to consider the plaintiff's bill of exceptions.

The defendants' sixteenth, seventeenth, seventy-fifth, seventy-ninth and eighty-fourth exceptions are sustained; their exceptions twenty-eighth to thirty-fifth, inclusive, sixty-second, sixty-sixth, sixty-seventh, one hundred fourth and one hundred fifth are overruled; and their other exceptions are not passed upon. The case is remitted to the superior court for a new trial.

CONDON, J., dissenting. I concur with that portion of the opinion of the court wherein defendants' exceptions are overruled and dissent from that portion wherein their other exceptions are sustained. The reasons for such dissent I shall state briefly.

I do not agree with the majority that it cannot be reasonably inferred from the evidence that Colonel Nicholson had

any knowledge of the extent of the wealth and income of his son, Paul Nicholson. On the contrary, it appears to me that there is not a little direct evidence from which such an inference is well nigh inescapable. Colonel Nicholson must have known that his son was a wealthy man. He certainly knew his son's income, as the second highest executive officer of the Nicholson File Company, of which Colonel Nicholson, himself, was the president; and he must have had a good idea whether his son's income from other sources was large or small. That Colonel Nicholson was ignorant of his son's social position and financial standing in the community or that he did not know generally the wealth that was necessary to support such a position or the income that a man of such large affairs would be likely to receive is so highly improbable as to be unbelievable.

It is impossible for me to say that all of this is mere speculation or surmise. But even if it were, it is difficult, under the circumstances here, to conclude that the admission of the evidence of Paul Nicholson's wealth and income was so prejudicial to the defendants as to justify vitiating the jury's verdict. On the contrary, it seems to me that if it was error it was clearly harmless, especially in the face of all the other evidence in the case as to the active interest of Paul Nicholson in his father's enterprises, while he, Colonel Nicholson, was living, and his succession upon his father's decease to some of the latter's important executive positions.

To disturb a jury's verdict in a civil case on a mere evidentiary point of law is a grave responsibility which appellate courts hesitate to assume unless they are clearly convinced of the probability that the jury was led astray by such inadmissible evidence. In less clear cases they decline to do so. Such a case I deem the instant one to be and I am, therefore, of the opinion that defendants' sixteenth and seventeenth exceptions should be overruled.

The seventy-fifth exception is to a portion of the trial justice's charge to the jury, wherein it is alleged that he

expressed an opinion on the weight of the evidence with particular reference to the testimony of Henry G. Clark. This exception, I think, is clearly lacking in merit. It is true that the comment of the trial justice, which is quoted in the majority opinion, does, if thus divorced from its context and viewed without regard to the actual testimony of Mr. Clark, appear to invade the province of the jury. But it seems to me that what the trial justice did was merely to recall to the mind of the jury with substantial exactness the content of Mr. Clark's testimony. That witness had been interrogated as to whether he had "any particular reason" for observing what happened on the occasion of the dinner in honor of the plaintiff at Colonel Nicholson's home in 1930, and he answered, "No".

The incorporation, substantially, of this testimonial language by the trial justice in his charge, though perhaps somewhat incautious, could not, in my opinion, have prejudiced the defendants. The jury already knew from Mr. Clark's testimony that he had no particular reason for observing what took place at that time. If the trial justice's language to the same effect is so phrased as to appear to be a conclusion, it is no more so than the uncontradicted fact which came from Mr. Clark's own lips. Moreover, this instruction manifestly did not take from the jury the right to determine whether or not the events testified to by Mr. Clark took place, but it merely went to his credibility in view of his own admission that on the occasion of the dinner he had no particular reason for observing what took place. It could not reasonably be said, under such circumstances, that the trial justice had thereby usurped the function of the jury to the prejudice of the defendants. And when the full context of the charge on this point is read this becomes clear beyond question.

The seventy-ninth exception is to another portion of the charge quoted in full in the majority opinion. The reason, or one of the reasons, given by the defendants for their objec-

tion thereto is that the trial justice did not at that point in the charge further instruct the jury "that the existence of all that money should not in any way prejudice their consideration of the case, if they found all the facts in defendants' favor." It should be noted, however, that the exception here is not to a refusal to supplement the charge as above suggested. In their brief defendants group this exception with the seventy-eighth and ninety-sixth exceptions on the ground that they were all erroneous, due to the failure of the trial justice to instruct the jury on the question of inadequacy of consideration. The reason quoted in the majority opinion appears to be the one which has impressed the court and persuaded it to sustain defendants' exception. In my opinion, however, it is not, in itself, a good ground for holding that the trial justice erred.

Whatever the true ground of the exception may be, the portion of the charge objected to does not appear to me to be open to the strictures that the majority have placed upon it in their opinion. It is my opinion, under all the circumstances, that the jury was sufficiently and fairly instructed by that portion of the charge objected to here, and that the trial justice did not err in not supplementing it, as defendants argue. But even were I in accord with the majority of the court on that question, I would still be of the opinion that the charge as given did not mislead the jury nor did it tend to leave them with a misunderstanding of the true situation; and therefore it was not prejudicial.

The eighty-fourth exception is to that portion of the trial justice's charge wherein he referred to witnesses who were business associates of Samuel Nicholson in his lifetime and who testified as to his unsoundness of mind. The ground of this exception is that the charge was tantamount to a direction to the jury to weigh the testimony as the trial justice indicated in his comments thereon. The majority opinion takes the view that, while it was not tantamount to such a direction, it was nevertheless a conclusion by the trial justice

that the testimony of such witnesses was of little or no weight and that he thereby clearly invaded the jury's province. With this view I cannot agree. The alleged objectionable portion of the charge shows on its face that the trial justice was suggesting to the jury that they draw the veil of charity over the witnesses in question and take, not the worst view of their testimony, but one more favorable to the defendants.

If anyone could be said to have been prejudiced by such an attitude on the part of the trial justice it was the plaintiff and not the defendants. To suggest to the jury even indirectly, as the trial justice did, that they try to disabuse their minds of any inference from the testimony of the defendants' witnesses that they were not telling the truth on the witness stand is certainly not prejudicial to the defendants. If the language of the charge is carefully read and it is remembered that the words of the trial justice fell upon the ears of the jury while their minds were fresh with the recollection of the actual testimony of the witnesses in question, any difficulty which arises from a casual examination of the charge in cold type is quickly dissolved; and it becomes obvious that the defendants really lost nothing by this charge. It is significant that no case has been cited where a charge similar to this one has been held a ground of error.

The charge which was strongly disapproved in *Pompei* v. *Cassetta*, 63 R. I. 74, cited in the opinion of the majority, is not, in my opinion, in any way comparable to that portion of the charge here objected to by the defendants. In that case there was a gross breach of duty on the part of the trial justice; one of the worst, if not the worst, to be found in our reports. Therefore, the citation of that case here does not seem to me to be helpful. Of course, in so far as it lays down the general principle that the trial justice is not authorized either to charge his own opinions of the evidence or pass upon the credibility of the witness, it is applicable. But that principle is not questioned here, although the plaintiff does contend, and I think quite properly, that, in accordance with

the rule as we expounded and applied it in *Reynolds* v. *Davis*, 55 R. I. 206, the charge in the instant case is proper. In the *Pompei* case it was necessary for us to state that principle because the charge of the trial justice constituted so gross a violation of it. Even the party who had prevailed below did not, in that case, contend that the trial justice's remarks were either proper or without prejudice. On the contrary, he acknowledged the principle above stated but contended merely that the excepting party had not taken his exceptions properly.

The case of *State* v. *Gallogly*, 47 R. I. 483, also seems to me to be of dubious pertinency here. It is true that there this court said, "if a trial justice has once given the jury a clear impression that he believes or disbelieves the testimony of a witness such an impression is not eradicated by instructions, formal or otherwise, that it is the sole province of the jury to decide which witnesses are telling the truth." But the mere statement of that principle is not enough for our purposes; we must look to the application of that principle to the particular language of the charge under review. If we thus look further into the opinion in the *Gallogly* case we find that the court after stating the principle above mentioned, nevertheless overruled defendant's exception to a charge that was even more forcible in its comment on the witnesses, and more revelatory of the trial justice's opinion thereof than the one before us in the instant case.

The majority also cite *Scott* v. *McGroarty*, 48 R. I. 79. But in that case the trial justice's charge was so clearly an invasion of the province of the jury that this court had no difficulty at all in holding that the charge was erroneous. Although the dereliction of the trial justice in that case was not as flagrant as in the *Pompei* case, it falls in the same category, where it is obvious that the trial justice has usurped the function of the jury.

For the reasons above stated, I am of the opinion that the eighty-fourth exception should be overruled. I have not

considered defendants' other exceptions, as no useful purpose would be served in doing so, in view of the fact that the majority opinion does not treat them.

*Ira Lloyd Letts, Gerald Donovan, Andrew P. Quinn, Alan P. Cusick, Samson Nathanson,* for plaintiff.

*Eugene A. Kingman, William H. Edwards, William C. Waring, Jr., Edwards & Angell,* for defendants.